[S.F. No. 24201. Feb. 9, 1981.]

SIERRA CLUB et al., Plaintiffs and Appellants, v.
CITY OF HAYWARD, Defendant and Respondent;
Y. CHARLES SODA et al., Real Parties in Interest and Respondents.

844

## COUNSEL

Julie E. McDonald and Laurens H. Silver for Plaintiffs and Appellants.

Nicholas C. Arguimbau, E. Clement Shute, Jr., Mark I. Weinberger and Shute, Mihaly & Weinberger as Amici Curiae on behalf of Plaintiffs and Appellants.

John W. Scanlon, City Attorney, for Defendant and Respondent.

Berliner, Cohen & Biagini and Jeffrey P. Widman for Real Parties in Interest and Respondents.

## OPINION

MOSK, J.—In this administrative mandamus proceeding (Code Civ. Proc., § 1094.5) we are asked for the first time to construe the provisions of the California Land Conservation Act of 1965 (Gov. Code, § 51200 et seq., hereinafter called the Williamson Act) that authorize cancellation of land preservation contracts made pursuant to that act. The Sierra Club and others (Sierra Club)[1] appeal from a judgment denying a writ of mandamus to set aside the Hayward City Council's partial cancellation of a Williamson Act agreement between the city and landowners Y. Charles and Helen Soda.

Sierra Club contends that the findings made by the city council are not supported by substantial evidence, and that they do not support the

[1]The other petitioners are Hayward Hills Property Owners Association, Hayward Area Planning Association, People for Open Space, and Sherman Lewis.

council's conclusion that cancellation of the land preservation agreement was appropriate to allow subdivision and development of the contracted land. It alleges that the council failed to make findings implicitly required by the cancellation provisions of the Williamson Act, and otherwise failed to properly apply those provisions. We conclude that the case is an appropriate subject for administrative mandamus and that the city council applied the cancellation provisions incorrectly, both in failing to make certain findings and in making other findings unsupported by substantial evidence.

I

The Sodas own a 2,300-acre cattle ranch in the foothills rising along the eastern edge of the City of Hayward. Until 1979, 600 acres of the land were part of an agricultural preserve created by Hayward in 1969, and were subject to a Williamson Act agreement that restricted the land to agricultural use or compatible uses for 10 years. Because the agreement had been annually renewed since 1969, the 10-year restriction had not begun to lapse.

In January 1978 the Sodas petitioned the city for cancellation of their land preservation agreement as to a 93-acre parcel of their ranch. In the same month, Ponderosa Homes (Ponderosa) filed with the city a zone change application requesting that the 93-acre parcel be rezoned from "agricultural" to "planned development" so as to enable Ponderosa to build thereon an upper-middle income residential subdivision. The city planning commission denied Ponderosa's application, and Ponderosa appealed to the city council. Early in 1979, the city council considered both the zone change application and the cancellation request.

The Williamson Act authorizes approval of a cancellation request only if the relevant agency finds "(a) That the cancellation is not inconsistent with the purposes of [the act]; and [¶] (b) That cancellation is in the public interest." (Gov. Code, § 51282, 1st par.) Section 51282 continues: "The existence of an opportunity for another use of the land involved shall not be sufficient reason for the cancellation of a contract. A potential alternative use of the land may be considered only if there is no proximate, noncontracted land suitable for the use to which it is proposed the contracted land be put.

"The uneconomic character of an existing agricultural use, shall likewise not be sufficient reason for cancellation of the contract. The uneconomic character of the existing use may be considered only if there is no other reasonable or comparable agricultural use to which the land may be put."

After holding public hearings as required by statute (Gov. Code, § 51284), the city council cancelled the contract and granted the requested zoning change, clearing the way for the proposed subdivision. The council made the following findings to justify its decision:

"The Council hereby determines that the partial cancellation of the . . . Land Conservation Agreement is not inconsistent with the purposes of the California Land Conservation Act of 1965 and is in the public interest by reason of the following:

"Removal of this relatively small area from the agricultural preserve will not jeopardize the continued use of the remaining lands in the preserve for grazing purposes;

"Potential conversion to subdivision development by persons other than applicants [i.e., by Ponderosa] is neither premature nor unnecessary; such development would be of benefit to urban dwellers requiring housing accommodations as an orderly extension of contiguous residential subdivisions;

"Potential retention within the subject land and dedication to the City of Hayward as open space of an area in excess of 30 acres will contribute to the esthetic, physical, and open space environment of adjacent property owners and of the City as a whole." (Hayward City Council Res. No. 79-012 C.S.)

## II

The city raises a preliminary objection to our consideration of the case. It contends that its decision to cancel the contract is legislative in nature and is therefore reviewable only in an ordinary mandamus action (Code Civ. Proc., § 1085), and reversible only if arbitrary, capricious, or entirely lacking in evidentiary support. (*Strumsky v. San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 34, fn. 2 [112 Cal.Rptr. 805, 520 P.2d 29].) The city would thus have us

hold that the cancellation procedure is a quasi-legislative function analogous to the passage of zoning ordinances (*Arnel Development Co.* v. *City of Costa Mesa* (1980) *ante*, 511, 514 [169 Cal.Rptr. 904, 620 P.2d 565], and cases cited) and annexation decisions (*City of Santa Cruz* v. *Local Agency Formation Com.* (1978) 76 Cal.App.3d 381, 387 [142 Cal.Rptr. 873], and cases cited).

Firmly established precedent, however, compels a different conclusion. We have repeatedly held that administrative mandamus is appropriate "for the purpose of inquiring into the validity of any final administrative order or decision made as the result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken and discretion in the determination of facts is vested in the inferior tribunal, corporation, board or officer . . . ." (Code Civ. Proc., § 1094.5, subd. (a); see, e.g., *Boren* v. *State Personnel Board* (1951) 37 Cal.2d 634, 637 [234 P.2d 981]; *Temescal Water Co.* v. *Dept. Public Works* (1955) 44 Cal.2d 90, 101 [280 P.2d 1]; *Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506, 514, fn. 12 [113 Cal.Rptr. 836, 522 P.2d 12].) The statute at hand clearly requires a public hearing (Gov. Code, § 51284) and discretionary weighing of evidence in order to make required findings (*id.*, § 51282). Furthermore, cancellation proceedings are classically adjudicatory in nature: the landowner must initiate the proceedings by filing a petition for cancellation; the council sits as arbiter, hearing evidence from proponents and opponents; and in every case the ultimate decision, unlike most zoning and annexation decisions, directly affects only one parcel. (Compare *Arnel, supra*, 28 Cal.3d 511, holding that a zoning initiative that affected only three parcels was nonetheless a legislative act.) ■ ■■ ■■ Accordingly, we agree with the trial court that cancellation of a land preservation agreement is adjudicatory and therefore reviewable in a proceeding brought under the provisions of section 1094.5.[2]

---

[2]The parties dispute the legitimacy of some of the trial court's determinations because it allegedly made certain procedural errors in arriving at them. We need not address these matters because we are not bound by the trial court's rulings on the law. In an administrative mandamus action "wherein no limited trial de novo is authorized by law, . . . the trial court itself exercises an essentially appellate function in that only errors of law appearing on the administrative record are subject to its cognizance. . . . [T]herefore, the trial and appellate courts occupy identical positions with regard to the administrative record, and the function of the appellate court, like that of the trial court, is to determine whether that record is free from legal error." (*Merrill* v. *Department of Motor Vehicles* (1969) 71 Cal.2d 907, 915-916 [80 Cal.Rptr. 89, 458 P.2d 33].)

## III

We reach the question whether the city council abused its discretion in cancelling the land preservation agreement. A comprehensive answer must begin with an analysis of the Williamson Act and its purposes.

The Williamson Act was the Legislature's response to two alarming phenomena observed in California: (1) the rapid and virtually irreversible loss of agricultural land to residential and other developed uses (see Falasco, Preserving California's Agricultural Green, prepared for Sen. Com. on Governmental Organization (1976) p. 59; Land, *Unraveling the Rurban Fringe: A Proposal for the Implementation of Proposition Three* (1968) 19 Hastings L.J. 421, 422-424 (hereinafter *Unraveling the Rurban Fringe*); Fellmeth, The Politics of Land (1973) pp. xv, 29), and (2) the disorderly patterns of suburban development[3] that mar the landscape, require extension of municipal services to remote residential enclaves, and interfere with agricultural activities (see Gov. Code, § 51220, subd. (b); *Kelsey* v. *Colwell* (1973) 30 Cal.App.3d 590, 594 [106 Cal.Rptr. 420]; *Unraveling the Rurban Fringe, supra*, at pp. 423-424). The Legislature perceived as one cause of these problems the self-fulfilling prophecy of the property tax system: taxing land on the basis of its market value compels the owner to put the land to the use for which it is valued by the market. As the urban fringe approaches, the farmer's land becomes valuable for residential development. His taxes are therefore increased, although his income is likely to shrink as more costly practices must be undertaken both to avoid interfering with his new neighbors and to protect his crops, livestock, and equipment from their intrusion. (Falasco, *op. cit. supra*, at p. 52; *Unraveling the Rurban Fringe, supra*, at pp. 423-424.) Often the farmer is forced to sell his land to subdivision developers, sometimes long before development is appropriate. As houses go up, so does the value of the remaining agricultural land, and the cycle begins anew.

To combat the problem, the Legislature passed the Williamson Act on the basis of the following findings:

"(a) That the preservation of a maximum amount of the limited supply of agricultural land is necessary to the conservation of the state's

---

[3]This phenomenon is variously known as "patchwork," "checkerboard," and "leapfrog" development, or more ominously, "scatteration," "slurbs," and "urban sprawl." (See *Unraveling the Rurban Fringe, supra*, at p. 423, for works in which the last three terms are used.)

economic resources, and is necessary not only to the maintenance of the agricultural economy of the state, but also for the assurance of adequate, healthful and nutritious food for future residents of this state and nation.

"(b) That the discouragement of premature and unnecessary conversion of agricultural land to urban uses is a matter of public interest and will be of benefit to urban dwellers themselves in that it will discourage discontiguous urban development patterns which unnecessarily increase the costs of community services to community residents.

"(c) That in a rapidly urbanizing society agricultural lands have a definite public value as open space, and the preservation in agricultural production of such lands, the use of which may be limited under the provisions of this chapter, constitutes an important physical, social, esthetic and economic asset to existing or pending urban or metropolitan developments." (Gov. Code, § 51220.)

The act empowers local governments to establish "agricultural preserves" consisting of lands devoted to agricultural uses and other uses compatible therewith. (*Id.*, § 51230.) Upon establishment of such preserves, the locality may offer to owners of included agricultural land the opportunity to enter into annually renewable contracts that restrict the land to open space use for at least 10 years. (*Id.*, §§ 51240, 51242, 51244.)[4] In return, the landowner is guaranteed a relatively stable tax base, founded on the value of the land for open space use only and unaffected by its development potential. To resolve all doubts about the constitutionality of this use-value taxation scheme, the Constitution was amended to include article XXVIII (now art. XIII, § 8), declaring that "To promote the conservation, preservation and continued existence of open space lands, the Legislature may define open space land and shall provide that when this land is enforceably restricted, in a manner specified by the Legislature, to recreation, enjoyment of scenic beauty, use or conservation of natural resources, or production of food or fiber, it shall be valued for property tax purposes only on a basis that is consistent with its restrictions and uses."

---

[4]Originally the Williamson Act distinguished between "contracts" for the preservation of prime agricultural land, which required the approval of the State Director of Agriculture and ordinarily entitled the landowner to subsidy payments out of public funds, and "agreements" for the preservation of any land within an agricultural preserve, which required no state approval and created no entitlement to payments. (Former Gov. Code, §§ 51240, amended in 1969; 51250, repealed in 1972; 51255, re-

In order to deny the tax benefits of the act to short term speculators and developers of urban fringe land and to insure that the constitutional requirement of an "enforceable restriction" is met, the Legislature deliberately required a long-term commitment to agriculture or other open-space use. If neither party gives timely notice to the other of a contrary intent, the contract automatically renews itself each year, tacking on an additional year to the period of restriction. And although the landowner may terminate his contract at any time by giving notice to the contracting government entity, he may not develop the land for the balance of the contractual period of restricted use. (Gov. Code, § 51246.)[5] Once the landowner serves a notice of nonrenewal, taxes on his property gradually return to the level of taxes on comparable nonrestricted property, as the term of restriction draws nearer to expiration. (Rev. & Tax. Code, § 426.)

The above-described nonrenewal procedure is the "intended and general vehicle for contract termination." (Land Use Research Group (U.C. Davis), Measures for Strengthening the California Land Conservation Act: An Economic and Legal Analysis, Rep. to the Assem. Select Com. on Open Space Lands (1974) p. 63.) The Legislature recognized that in rare instances unforeseen events might require the release of land from its contractual restriction before that restriction lapses by its own terms. The Legislature declared, however, that cancellation of Williamson Act contracts is permissible *"only* when the continued dedication of land under such contracts to agricultural use is neither necessary *nor desirable* for the purposes of [the act]." (Italics added; Gov. Code, § 51280.) The cancellation provisions were included "As a means of dealing with *strictly emergency situations* where the public interest no longer dictates that the contract be continued . . . ." (Italics added; Preliminary Rep. of Joint Com. on Open Space Land (1969) p. 10, Appen. to Sen. J. (1969 Reg. Sess.).)[6]

---

pealed in 1969; 51261, repealed in 1969.) When the requirement of state approval and the payment incentive were eliminated in 1969, so was the distinction between agreements and contracts, and the former term was eliminated from the act. Although the Soda's document is an "agreement," its cancellation provisions are identical to those imposed by the act on contracts. Therefore, our discussion is equally applicable to the latter.

[5]The local government is also free to terminate by giving notice of nonrenewal. (Gov. Code, §§ 51236, 51246.)

[6]See Land Use Research Group, *op. cit. supra*, at page 63: "A secondary means of contract termination, immediate cancellation, is permitted only under exceptional circumstances." See also *Unraveling the Rurban Fringe, supra*, at page 433, footnote 62: "The cancellation provisions appear to be limited to cases where due to changed circumstances it is no longer desirable to maintain the preserve."

The Attorney General has consistently agreed that nonrenewal is the preferred termination method: "If a landowner desires to change the use of his land under contract to uses other than agricultural production and compatible uses, the proper procedure is to give notices of non-renewal pursuant to section 51245." (54 Ops.Cal.Atty.Gen. 90, 92 (1971).) He has found cancellation impermissible "except upon ex-tremely stringent conditions." (62 Ops.Cal.Atty.Gen. 233, 240, fn. 6 (1979).)

Not only do existing authorities unanimously support a narrow appli-cation of the cancellation provisions, an analysis of the effect of lenient construction shows that "easily available cancellation will render the Act ineffective as a land-use control device." (Land Use Research Group, *op. cit. supra*, at p. 73.) The act is intended to preserve open space land. But if those with an eye toward developing such land within a few years are allowed to enroll in contracts, enjoy the tax benefits during their short holding period, then cancel and commence construc-tion on a showing that the land is ripe for needed housing, the act would simply function as a tax shelter for real estate speculators. The Legislature's findings clearly spell out its intent, and nowhere among them appears a motivation to subsidize those who would subdivide. On the contrary, the overwhelming theme of the legislation is the need to preserve undeveloped lands in the face of development pressures.

Furthermore, apparently in response to criticism of the cancellation provisions as inviting abuse of the act (Land Use Research Group, *op. cit. supra*, at p. 73; Fellmeth, *op. cit. supra*, at pp. 41-42), in 1978 the Legislature reaffirmed its resolve to make cancellation the exception to the general rule of termination by nonrenewal. In addition to a cancel-lation fee, which had accompanied cancellation since the inception of the act (Gov. Code, § 51283), the Legislature imposed a further charge partially recapturing the tax benefits enjoyed by the landowner under the contract (Gov. Code, § 51283.1).

In short, we harbor no doubt that the Legislature intended cancella-tion to be approved only in the most extraordinary circumstances. Having in mind the structure of the act and the Legislature's plain declaration of purpose, we look next to the details of the cancellation provisions to determine more precisely the nature of those circumstances.

A.

■ We start with the statute's requirement of a finding that the cancellation is "not inconsistent with the purposes of" the act. (Gov. Code, § 51282, 1st par., subd. (a).) Although the city council made such a finding, the evidence to justify it was not substantial.

Substantial evidence does appear in the record to support the council's findings that the land was a logical site for the extension of suburban development, that dedication of 30 acres of the site to open space use was consistent with the purposes of the act, and that development of the parcel would not seriously jeopardize nearby agricultural uses. We do not believe, however, that the evidence supporting those findings is sufficient to sustain the ultimate determination of consistency with the purposes of the act. We have seen that the Legislature intended nonrenewal as the ordinary contract termination method; no evidence appears in the record to demonstrate that compliance with the nonrenewal process would have interfered with the city's orderly development or defeated any other purpose served by cancellation. It is inconsistent with the purposes of the act to allow abrupt cancellation if nonrenewal would accomplish the same objective. Therefore, there must be substantial evidence that awaiting the normal termination of the contract would fail to serve the purposes that purport to justify cancellation.

Furthermore, if the parties are able to predict generally when the land will be ripe for development, the purposes of the act are defeated if the owner is nonetheless allowed to continually renew his contract and extend his commitment year after year, then cancel whenever development becomes most profitable. In this case, the evidence shows that both parties to the agreement knew or should have known in 1969 that the subject land would soon be ripe for development, yet both continued to renew the agreement year after year until the zone change application in 1978.[7] The city planning department report of November 30, 1978, reveals that the planning department and planning commission both recommended in 1969 that the parcel for which cancellation is now proposed not be included in the agricultural preserve; according to the report, "The Commission made this recommendation because the

---

[7]Even after the zone change application was filed, the Sodas attempted to keep the agreement intact by making their request for cancellation conditional upon the success of that application. (Letter from Y. C. Soda to William Handley, city manager.)

land was capable of being developed . . . ." Moreover, the city's General Policies Plan Map, adopted in 1971, designated the parcel for "Suburban Residential Use." (*Ibid.*) The comments of the mayor at the close of the cancellation hearings are also revealing: "I feel . . . it properly can come out of the Williamson Act preserve . . . . I didn't feel that it should have gone in nine years ago, and I'm, I guess surprised that it's taken nine years for a development proposal to come in on it because it was so clearly to me the next piece of land that would be developed . . . ." Absent some evidence to counterbalance this proof that the land's present ripeness for development was wholly predictable, to permit cancellation now would frustrate the legislative intent to require nonrenewal at the time the parties can predict that a change in use will be desirable at the end of the contractual term.

Finally, it is the purpose of the act to extend tax benefits to those who voluntarily subject their land to "enforceable restrictions." (Cal. Const., art. XIII, § 8.) If cancellation were a simple matter of showing that the restricted land is now more valuable for a developed use, we doubt whether Williamson Act contracts could qualify as "enforceable restrictions" making the land eligible for taxation on use value rather than market value under the Constitution. Lax cancellation procedures might thereby defeat the intent of the Legislature to reduce the taxes on agricultural land in return for long-term binding commitments.

For the above reasons, we hold that cancellation is inconsistent with the purposes of the act if the objectives to be served by cancellation should have been predicted and served by nonrenewal at an earlier time, or if such objectives can be served by nonrenewal now. Although the city took into consideration the statutory purposes of preserving open space and achieving orderly development, as we think it must, it did not consider the Legislature's intent to limit cancellation to the extraordinary cases in which nonrenewal is inappropriate.

### B.

█ The act also requires a finding that cancellation is "in the public interest." (Gov. Code, § 51282, subd. (b).) We face the inevitable dispute over that imprecise phrase, the vision of which is often in the eye of the beholder. Fortunately in this instance the Legislature provides reasonably clear guidance for deciding which "public" and what "interests" are to be considered.

The city and Ponderosa contend that because the decision is in the hands of a local entity, the concerns of only the local public should be pondered. They thereby read into the statute a refinement neither explicit nor implicit in its provisions. In fact, the statute is justified in part by a concern for "the agricultural economy of the *state* ... [and] for the assurance of adequate, healthful and nutritious food for future residents of this *state and nation*." (Italics added; Gov. Code, § 51220, subd. (a).) Moreover, the determination of public interest was originally to be made by the State Director of Agriculture. (Former Gov. Code, § 51282, repealed and reenacted 1969.) Because the state's economic participation in the contract scheme was reduced in 1969 and because at that time there was no evidence that local agencies were permitting unwarranted cancellations, the responsibility for judging the public interest and protecting the purposes of the act was transferred to the local agencies. (Prelim. Rep. of Joint Com. on Open Space Land (1969) p. 15, Appen. to Sen. J. (1969 Reg. Sess.).)[8] The shift evidenced not an abandonment of the concern for the interests of the public at large, but a belief that local decision-makers could adequately protect those interests without state oversight. Any decision to cancel land preservation contracts must therefore analyze the interest of the public as a whole in the value of the land for open space and agricultural use. Of course, the interests of the local and regional communities are also important, but no decision regarding the public interest can be based exclusively on their parochialism.

---

[8]According to the preliminary report, only one cancellation petition had been granted before 1969. In recent years however, local governments have been much more receptive to cancellation requests and the trend is toward a substantial increase in cancelled contracts. A recent survey complied the following cancellation statistics:

| Fiscal Year | All Land | | Urban Prime Land |
|---|---|---|---|
| | (acres) | (parcels) | (acres) |
| 1972-1973 | 710 | 8 | 15 |
| 1973-1974 | 6,330 | 14 | 79 |
| 1974-1975 | 513 | 14 | 303 |
| 1975-1976 | 3,504 | 27 | 64 |
| 1976-1977 | 3,385 | 24 | 302 |
| 1977-1978 | 12,148 | 110 | 354 |
| 1978-1979 | 7,181 | 95 | 1,122 |

(State Bd. of Equalization, Assessment Practices Survey (1980) appendix III, p. 7.) In light of the purposes of the Williamson Act, the figures are especially alarming when coupled with recently published findings revealing that the San Francisco Bay Area alone has already lost nearly three-fourths of a million acres of farmland since 1950 and is losing more every day at an accelerating rate. (People for Open Space, Endangered Harvest: The Future of Bay Area Farmland (1980) p. 64.)

Next, we determine the nature of the "interests" the Legislature intended local agencies to consider. The legislative findings recited above clearly show that body was primarily interested in the preservation of open space land and the orderly development of urban areas. Additional evidence of such intent is found in former section 51223 of the Government Code, which spelled out the public interest served by the creation of agreements like that between the city and the Sodas.[9] Section 51223 declared that agreements limiting the use of the land to agriculture are in the public interest "insofar as any such agreements tend to maintain the agricultural economy of the state, prevent premature and unnecessary conversion of land from agricultural uses, assist in the preservation of prime agricultural lands, or are otherwise consistent with the purposes of this [act]."

Inasmuch as a decision that cancellation is in the public interest reflects the conclusion that continued restriction is contrary to the public interest, the criteria for originally restricting the use of the land seem equally relevant to cancellation. Thus, preservation of land in agricultural production is of paramount importance. In providing for cancellation, however, the Legislature recognized the relevance of other interests as well.

The government's decision to enter such an agreement is a conclusion to bestow tax benefits on the landowner in return for the achievement of a specific goal—preservation of open space land. In making that decision, normally the only concern is whether the government will achieve the declared purposes in return for the revenues it will forego. But in providing for cancellation, the Legislature appears to have entertained the possibility that other public concerns—e.g., housing, needed services, environmental protection through developed uses, economic growth or employment—could conflict with the interests in open space. Otherwise, it would be difficult to conceive of any instance in which cancellation would be appropriate. But because the act is explicitly and unequivocally protective of the open space objectives, it must be shown that they are substantially outweighed by other public concerns before cancellation can be deemed "in the public interest."

In this case, the record discloses a need for additional upper-income housing of the proposed type in the Hayward area. It also discloses,

---

[9]Section 51223 was deleted in 1969 when the agreement provisions of the act were eliminated. (See fn. 4, *ante*.) Nonetheless, it is obviously relevant to our inquiry regarding the meaning the Legislature ascribed to the term "public interest" in the 1965 cancellation provisions, as applied to an agreement formed before the 1969 deletion.

however, that the remaining grasslands within the city limits make "an unsurpassed contribution to the scenic quality of the hills that form the backdrop to the City" (environmental impact report (hereinafter EIR), part B, p. 25), and that the Soda property offers "valuable ... winter-spring livestock forage" (EIR Draft, p. 31). Because we are uncertain whether the city council found the public interest in the open space use substantially outweighed by the public interest in additional housing, and because we dispose of the case on other grounds, we refrain from weighing the substantiality of the evidence on this issue.

### C.

Next we discuss the requirement that before an alternative use of the restricted land is considered, the decision-maker must determine there is "no proximate, noncontracted land suitable for the use to which it is proposed the contracted land be put." (Gov. Code, § 51282, 2d par.)

We are first asked whether an explicit finding regarding such proximate alternative sites is required. The answer is dictated by our holding in *Topanga Assn. for a Scenic Community* v. *County of Los Angeles, supra*, 11 Cal.3d 506 (hereinafter *Topanga*). There, a local planning commission granted a zoning variance on the basis of certain features of the applicant's property rendering it unattractive for the type of development for which it was zoned. But state law authorizes zoning variances only upon a showing of "special circumstances" distinguishing the subject property from surrounding parcels (Gov. Code, § 65906), and therefore requires a comparative analysis of the zoned properties. Although the evidence may have supported a variance on the basis of a comparative analysis, the record did not disclose whether such an analysis was in fact made. We therefore held that the grant of the variance was an abuse of discretion because the commission failed to "render findings sufficient both to enable the parties to determine whether and on what basis they should seek review and, in the event of review, to apprise a reviewing court of the basis for the board's action." (*Topanga*, at p. 514.) In support of our conclusion, we found that "implicit in [Code of Civil Procedure] section 1094.5 is a requirement that the agency which renders the challenged decision must set forth findings to bridge the analytic gap between the raw evidence and ultimate decision or order.... [In section 1094.5,] the Legislature sought to direct the reviewing court's attention to the analytic route the administrative agency

traveled from evidence to action. In so doing, we believe that the Legislature must have contemplated that the agency would reveal this route." (*Id.*, at p. 515.)

The problem we faced in *Topanga* recurs here: we are left without a basis for determining whether the administrators strayed from the statutorily created pathway from evidence to ultimate conclusion. The Williamson Act allows the local agency to consider alternative uses of the restricted land only if it first determines that suitable nonrestricted sites are unavailable. The city admittedly considered an alternative use, subdivision construction, in cancelling the contract. We must therefore determine whether it fulfilled the statutory prerequisite of considering proximate alternative sites.

In some cases, an agency's fulfillment of statutory prerequisites may be obvious to the reviewing court from the record of the agency proceedings, and no formal findings may be necessary. If the agency is required to hold public hearings, for instance, the record will generally reveal whether it has done so. But in this case we do not know, and cannot ascertain from a review of the evidence, whether or not the city council complied with the statutory prerequisite. That it did in fact consider the proposed use of the restricted property is no proof that it had previously looked for and failed to find proximate alternative sites for that use. Nor is the presence in the record of scattered and contradictory evidence that alternative sites are unavailable[10] sufficient to satisfy us that the council made a deliberate determination of the issue. Indeed, even the existence of substantial evidence to support a necessary determination would not compel a conclusion that the determination was in fact made. The substantial evidence test compels courts only to sustain existing findings supported by such evidence, not to hypothesize new findings. (See, e.g., *Savelli* v. *Board of Medical Examiners* (1964) 229 Cal.App.2d 124, 131-132 [40 Cal.Rptr. 171].) Because the council failed to confirm that it considered alternative uses only after determining that proximate alternative sites were unavailable, we conclude that the findings it did make were insufficient to support its conclusions.

---

[10]Evidence tending to support that conclusion includes (1) an equivocal statement by the mayor that in the immediate vicinity of the Soda property no other land is available for large scale executive-type housing, although the "Batteate property...is wending its way to us"; (2) the conclusion of the 1978 planning department report, rejected by the planning commission, that "no other parcel is proximate and suitable for the size, type and use proposed"; and (3) a statement by Ponderosa's representative that no proximate land is available for a similar housing development. On the other hand, (1) the EIR mentions alternative sites that "could require less investment in capital costs

Ponderosa contends that because in section 51282 the Legislature expressly required findings that cancellation be (a) consistent with the purposes of the act and (b) in the public interest, its failure to also prescribe findings on other prerequisites listed in the same section is an implied declaration that the latter findings need not be made. But such additional findings are necessary to insure that the broader purposes of the act are met, and to provide "a framework for principled decision-making" in the courts. (*Topanga*, at p. 516, fn. 15, of 11 Cal.3d.) Although the Legislature did not explicitly require findings regarding alternative sites, we have no doubt it intended local agencies to comply with the statutory scheme by making the prescribed determination. The courts are entrusted with the duty under Code of Civil Procedure section 1094.5 to ascertain whether the statutory procedures are followed. The fact that certain findings are explicitly required by the Legislature and obediently made by the agency does not relieve us of our duty. (*Topanga*, at p. 517, fn. 16.) Therefore when findings are necessary to ascertain whether the mandated determinations have been made, we will not hesitate to require an adequate showing of compliance.

Moreover, judicial vigilance is needed to prevent frustration of the land preservation goals of the Williamson Act. Just as in *Topanga* superficial judicial review could have subverted the decision-making structure of the zoning variance scheme, and thereby rendered meaningless applicable state and local legislation prescribing variance requirements (*Topanga*, at p. 517), so here could it completely emasculate the rigorous requirements that must be met to justify cancellation of a land preservation contract.[11]

██ In addition to their disagreement over the necessity of findings, the parties dispute the correct application of the words "proximate" and "use" as they are employed in the second paragraph of Government Code section 51282. ██ ██ ██ ██ Although it might be possible to frame a rigid and precise definition of those terms, we believe the Williamson Act requires a flexible approach.[12]

for public services, and avoid development of an ecologically and geologically sensitive area" (EIR Draft at p. 62); (2) one councilman commented that "There is other land in the immediate vicinity that is quite reasonably considered to be available for a similar use"; and (3) various comments in part B of the EIR suggest that alternative sites are available (EIR, part B, at pp. 47, 60, 79, 103).

[11]See Land Use Research Group, *op. cit. supra*, pages 75-76, for a discussion of the various incentives tempting local governments to improperly cancel land preservation contracts.

[12]It is a well-established legal principle that the purpose of a statute is a guiding star in defining the language it employs: "'the objective sought to be achieved by a statute

 We begin by rejecting two obviously improper interpretations of "proximate." First, the word does not carry in this context the layered encrustations it has acquired through the gradual evolution of causation principles in criminal law and the law of torts. We are here concerned with relationships spatial, not causal. Second, the policies of the act dictate that we distinguish "proximate" from "contiguous." Although in other contexts the two are sometimes used synonymously, "proximate" does not imply the immediacy of contact that is associated with the other term: to be near is not necessarily to touch. Moreover, such a narrow construction would lead to absurd results: restricted land completely surrounded by other restricted land would be a prime candidate for development if immediate contiguity were the test, even if hundreds of acres of suitable unrestricted land lay just outside the restricted zone.

We believe "proximate" should be construed in the same manner courts have contrued the similar word "adjacent"; that is, to effectuate "the legislative intent and spirit of the act, though a literal or different construction may be possible." (*Bakersfield Community Hosp.* v. *Department of Health* (1977) 77 Cal.App.3d 183, 199 [142 Cal.Rptr. 773], citing *Select Base Materials* v. *Board of Equal.* (1959) 51 Cal.2d 640, 645 [335 P.2d 672].) Thus courts have found locations up to seven and one-half miles apart "adjacent" for the purposes of a particular statutory scheme. (*Oro Madre Unified Sch. Dist.* v. *Amador County Bd. of Education* (1970) 8 Cal.App.3d 408 [87 Cal.Rptr. 250].)

The purposes of the Williamson Act require that "proximate" not be construed to unreasonably limit the search for suitable noncontracted land. It would serve no purpose of the act to reject unrestricted property perfectly suited to fill the needs addressed by the proposal simply because that property is not in the immediate vicinity of the restricted land. In fact, under some circumstances land several miles from the proposed development site may be near enough to serve the same purposes. We therefore hold that "proximate" property means property close enough to the restricted parcel to serve as a practical alternative for the proposed use.

---

as well as the evil to be prevented is of prime consideration in [the word's] interpretation, and where a word of common usage has more than one meaning, the one which will best attain the purposes of the statute should be adopted, even though the ordinary meaning of the word is thereby enlarged or restricted ...." (*People* ex rel. *S.F. Bay etc. Com.* v. *Town of Emeryville* (1968) 69 Cal.2d 533, 543-544 [72 Cal.Rptr. 790, 446 P.2d 790], quoting from *People* v. *Asamoto* (1955) 131 Cal.App.2d 22, 29 [279 P.2d 1010].)

A similarly flexible construction should be applied to the term "use" in this context. If alternative sites could be rejected as long as they were unfit for an identical use, developers could easily describe the proposed use in so narrow a manner that it could be served only by the restricted parcel. For instance, the owner of a large ranch could expand his subdivision plans just enough to make his the sole available parcel large enough to accommodate them. Or in an area as topographically diverse as Hayward and its environs, a landowner could argue that particular subdivision plans must be designed for individual parcels and hence that the restricted parcel is uniquely suited for the proposed use. Although the landowner's characterization of the proposed use may be considered, we conclude that the public agency must be responsible for determining in each case the salient features of that use, and for deciding if another parcel, or a combination of contiguous or discontiguous parcels, could serve a substantially similar use. The size of the proposed development should not be a significant factor in the agency's search for alternative sites, unless by its very nature the developed use requires for its success a minimum amount of land. Otherwise, landowners will be encouraged to propose larger developments for which suitable alternative sites are less likely. The policies of curbing unnecessary development and of preserving open space dictate sparing larger undeveloped parcels when smaller ones will do, and militate against creating an irresistible incentive for developers to think big.

■ To conclude, we hold that an explicit finding is needed on the issue of proximate alternative sites and that the decision-maker should apply the words "proximate" and "use" in the manner described above.

### D.

■ One provision of section 51282 remains to be discussed. It requires that before the agency considers the uneconomic quality of the lands for agricultural use, it must determine that there is "no other reasonable or comparable agricultural use to which the land may be put." (*Id.*, 3d par.) In this case, the marginal productivity of the land in its present use was mentioned before the city council, remarked upon by council members, and made part of the findings in the resolution certifying the EIR. We cannot discern from the record, however, whether the council made the prerequisite determination to justify its consideration of the uneconomical character of the existing use. Our earlier discussion of the need for findings with regard to proximate alternative sites is equally applicable here.

Furthermore, we are disturbed by the council's apparent willingness to consider the existing use unprofitable and insignificant despite the fact that it is the same use to which the land was put when the agricultural preservation agreement was originally made. At that time, the city agreed that "the highest and best use of said property during the terms of this agreement or any renewal thereof is for agricultural and compatible uses." Yet the record is devoid of evidence showing that conditions have changed to make cattle ranching less profitable in the intervening years. The only change that seems to have influenced the council is the land's increased value for development. But surely the Legislature did not intend a particular use to be deemed uneconomic simply because the land would now be more valuable for development than for agricultural use. If the property was included in an agricultural preserve and was bound by a land preservation contract or agreement on the basis of a certain marginal use, that same use cannot later serve as justification for cancellation. The Legislature would not have extended tax benefits to marginally productive land unless it believed such land would serve the purposes of the act. Therefore, the landowner who argues that his land no longer serves the act's purposes because it is not valuable for agriculture must demonstrate the changed conditions, irrespective of increased development value, that now make his agricultural operation unprofitable. Of course, he must also satisfy the above-quoted explicit requirement of showing that no reasonable alternative agricultural uses would render the land economically viable.

## IV

In adopting the Williamson Act, the Legislature attempted to safeguard for the citizens of our state a legacy of rich and scenic land. California's agricultural industry is not only a vital part of the state's economy, it is a crucial source of nourishment for the entire nation, supplying 25 percent of all table foods and 40 percent of all fresh produce consumed by Americans. (Falasco, *op. cit. supra*, p. 51.) Unspoiled agricultural lands near cities provide not just food, but also a welcome scenic respite from the cluttered urban landscape.

Although the Williamson Act has been criticized as not reaching far enough to protect our agricultural heritage (*id.* at p. 65; Fellmeth, *op. cit. supra*, at pp. 41-42), it has also been generally recognized as an important first step in that direction. (Fellmeth, *op. cit. supra*, at p. 42; *Unraveling the Rurban Fringe, supra*, at p. 433; Preliminary Rep. of the Joint Com. on Open Space Land, *supra*, at p. 11.) To insure that

the Legislature's action is not eroded by lax administration, we have construed the cancellation provisions of the act narrowly. We believe the Legislature included those provisions in the act because it foresaw extraordinary situations in which the ordinary nonrenewal and expiration procedures would pose insurmountable obstacles to the accomplishment of pressing public needs. If a parcel of land is engulfed by urban development more rapidly than anyone anticipated it would be, if the land now stands in the way of orderly development serving public needs, and if its value for agricultural production is now negligible, it could be consistent with the purposes of the act to cancel the contract. Or, even if the land is still valuable for agriculture, it may be urgently needed for a use no other land can serve. For instance, in one case a Williamson Act contract was cancelled to allow use of the land as an oil sump because the parcel was uniquely fit for that purpose, and there was apparently an immediate environmental need justifying cancellation rather than nonrenewal. (See Land Use Research Group, *op. cit. supra*, p. 63.)

Manifestly we cannot and should not attempt to catalogue all the hypothetical circumstances in which cancellation would be appropriate. But we can give guidance to local governments in matters properly before us as to the correct interpretation of the statutory provisions they must apply. For the reasons stated, we conclude that the Hayward City Council incorrectly applied the cancellation provisions of the Williamson Act in the case at bar.

The judgment is reversed and the cause remanded to the superior court with directions to issue a writ of mandamus requiring respondent to vacate its cancellation of the Williamson Act agreement. The superior court is further authorized to award plaintiffs trial and appellate attorneys' fees if it determines that this case "has conferred a significant benefit ... on the general public or a large class of persons" and that "the ... burden of private enforcement [is] such as to make the award appropriate." (Code Civ. Proc., § 1021.5, subds. (a), (b).) The trial court shall determine the amount of any fees to be awarded. Plaintiffs shall receive costs.

Bird, C. J., Tobriner, J., and Newman, J., concurred.

**RICHARDSON, J.**—I respectfully dissent. The City Council of Hayward did not abuse its discretion in cancelling the agreement in question.

This being an administrative mandamus proceeding, our task as a reviewing court is to determine "(b) . . . whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the . . . decision is not supported by the findings, or the findings are not supported by the evidence. [¶] (c) Where it is claimed that the findings are not supported by the evidence, . . . abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record." (Code Civ. Proc., § 1094.5, subds. (b), (c).) The majority apparently concedes that the council actèd properly and "proceeded in the manner required by law" in the conduct of the required hearings and in the receipt of relevant evidence. Nonetheless, it concludes both that the council failed to make necessary findings and that it made other necessary findings which lacked any foundational support in the record.

### Required Findings

What are the required findings in such a case? Section 51282 of the Government Code provides, in relevant part: "The board or council may approve the cancellation of a contract only if they find: [¶] (a) That the cancellation is not inconsistent with the purpose of this chapter; and [¶] (b) That cancellation is in the public interest." The section also provides that certain additional factors may be *considered* under certain circumstances in deciding whether to cancel an agreement, e.g. the uneconomic character of an existing use and the existence of alternative uses. Although expressly providing that neither of these latter considerations shall by itself constitute sufficient reason for cancellation, the statute does not require any formal findings as to them. The obvious reason is that these are but two illustrative examples of possible factors which may be considered by the council in making the twin findings of consistency with the purposes of the act and harmony with the public interest which, in contrast, *are* statutorily required before cancellation may be ordered.

In order to make the specified findings, then, the council must look to the "purpose of this chapter" and the "public interest" referred to therein. (Gov. Code, § 51282.) These are found in Government Code section 51220, where the Legislature describes the purpose and public interests served by the Williamson Act: (a) "the preservation of a maximum amount of the limited supply of agricultural land," (b) "the discouragement of premature and unnecessary conversion of agricultural land to

urban uses" and of resulting "discontiguous urban development patterns," and (c) the preservation of "open space" because of its "important physical, social, esthetic and economic asset to existing or pending urban or metropolitan developments." (*Ibid.*)

What did the council find? As the majority must acknowledge (*ante,* p. 848), the council *did* make the findings which were explicitly required by the statute to warrant its order of cancellation. It expressly found that the partial cancellation sought by real parties "is not inconsistent with the purposes of the California Land Conservation Act of 1965 and is in the public interest . . . ." (Hayward City Council Res. No. 79-012 C.S.) Moreover, the council specifically related those findings to the legislative purpose and public interest enunciated in the statute. On the basis of the record before it, the council determined that the removal of the "relatively small area" from the agricultural preserve would not jeopardize the agricultural use of surrounding lands, that the proposed subdivision development "is neither premature nor unnecessary" and would serve the public interest in providing required "housing accommodations as an orderly extension of contiguous residential subdivision," and that the proposed dedication of 30 of the 93 acres to the City of Hayward as an open space "will contribute to the esthetic, physical, and open space environment of . . . the City as a whole."

Such conclusions were wholly proper. They reflect the considered judgment of the local entity, speaking through its duly elected officials, after careful review of competing considerations and the exercise of an informed discretion on matters within the prerogative of local government. In making these findings, the Hayward City Council acted in full recognition of, and obedience to, the Legislature's expressed concerns (Gov. Code, § 51220) and in accordance with its statutory direction (*id.,* § 51282).

In reviewing the council's cancellation pursuant to these statutes, our next—and final—concern should be with the sufficiency of the record to support these findings. (Code Civ. Proc., § 1094.5, subds. (b), (c).) At this point the majority in my view strays far afield. "Reading between the lines" of the Williamson Act it discerns unexpressed legislative concerns and implicit requirements for additional council findings before cancellation is permitted.

The majority finds reversible error in the council's failure to make formal findings as to the "considerations" set forth in the statute relat-

ing to cancellation. (See Gov. Code, § 51282.) But formal findings as to the existence or nonexistence of all possible subsidiary considerations are not mandated by any applicable California statutory or decisional law. *Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506 [113 Cal.Rptr. 836, 522 P.2d 12], heavily relied upon by the majority, does not support any such requirement. Rather, *Topanga* held, within the context of a statute which imposed *no* requirement of findings before a variance could be granted by a local board, that the scope of review contemplated by section 1094.5 necessitated *some* "findings to bridge the analytic gap between the raw evidence and ultimate decision or order." (*Id.*, at p. 515.) We noted that the basis for such a requirement is that "'"the orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained." (*S.E.C.* v. *Chenery Corp.* (1943) 318 U.S. 80, 94.)' [Citations.]" (*Id.*, at p. 516.) To that end, we declared that the findings must "expose the board's mode of analysis," but specifically cautioned that they "'need not be stated with the formality required in judicial proceedings' [citation]." (*Id.*, at p. 517, fn. 16.)

In contrast to *Topanga*, the statute before us *does* require certain precancellation findings. The Legislature in Government Code section 51280 described the purpose of the termination of a Williamson Act contract, permitting such cancellation "only when the continued dedication of land under such contracts to agricultural use is neither necessary nor desirable for the purposes of this chapter." Accordingly, the Legislature insisted upon findings that any proposed cancellation be "not inconsistent" with those purposes and be "in the public interest." (*Id.*, § 51282.) Thus the statutory scheme here, quite unlike that in *Topanga*, does require "findings sufficient both to enable the parties to determine whether and on what basis they should seek review and, in the event of review, to apprise a reviewing court of the basis for the board's action." (*Topanga, supra*, 11 Cal.3d at p. 514.) Consequently, there is no necessity for judicially engrafting upon the Williamson Act any requirement that a local city council make any additional findings in order to permit appropriate section 1094.5 review. *Topanga* has very limited precedential force in evaluating the action of the Council of the City of Hayward.

After identifying the "public interests" which it is the purpose of the act to further, and acknowledging that the city council properly considered those interests in deciding to cancel the contract in question, the

majority still discovers error in the council's failure to consider an *additional* legislative intent.

Acknowledging that the Legislature "was primarily interested in the preservation of open space land *and the orderly development of urban areas*" (*ante*, p. 857, italics added), the majority then notes that the *same* criteria of open space preservation and orderly urban development govern both the initial entry of the parties into such agreements *and* their cancellation. (*Ante*, p. 857.) Finally, the majority concedes that the city *did* take into consideration "the statutory purposes of preserving open space and achieving orderly development . . ." in cancelling the contract in question. (*Ante*, p. 855.) Where, then, does the majority find error? In the council's failure to "consider the Legislature's intent to limit cancellation to the extraordinary cases in which nonrenewal is inappropriate." (*Ante*, p. 855.)

No such intent, however, appears anywhere in the legislation we are construing. In declaring that "there must be substantial evidence that awaiting the normal termination of the contract would fail to serve the purposes that purport to justify cancellation" (*ante*, p. 854), the majority makes the very error of which it accuses the council: it "thereby read[s] into the statute a refinement neither explicit nor implicit in its provisions." (*Ante*, p. 856.) Similarly, it distorts the act in concluding that cancellation becomes inconsistent with its purposes "if the objections to be served by cancellation should have been predicted and served by nonrenewal at an earlier time, or if such objectives can be served by nonrenewal now." (*Ante*, p. 855.) Where is the authority for such a novel proposition? With due deference, I suggest that there is none.

The majority's conclusion that "the Legislature intended cancellation to be approved only in the most extraordinary circumstances" (*ante*, p. 853) is unsupportable. Equally unfounded is its assertion that unique "purposes" or "objectives" must be established to warrant cancellation. To the contrary, the purpose of the cancellation provision is expressly declared, quite simply and clearly, to be "to provide relief from the provisions of [land preservation] contracts . . . *when the continued dedication of land under such contracts to agricultural use is neither necessary nor desirable* for the purposes of this chapter." (Gov. Code, § 51280, italics added.) Nowhere among the statutory grounds or considerations allowing cancellation is there any indication that exigent or "extraordinary" circumstances are required before cancellation may be

effected. (*Id.*, § 51282.) That novel thought springs from the majority, not from the statute.

Neither do the statutory provisions for partial recapture of tax benefits enjoyed by the landowner upon cancellation of such a contract (see Gov. Code, § 51283.1) express any legislative policy opposing cancellation. Rather, they represent an attempt to adjust the equities between the landowner and the taxing authorities. In the event cancellation is deemed otherwise appropriate and is the chosen method of termination, the phased-in increase in taxes to which the taxing authority would be entitled under the nonrenewal provision of the act (see Rev. & Tax. Code, § 426) is approximated by such recapture. The Legislature's attempt to achieve fairness demonstrates neither its "resolve to make cancellation the exception to the general rule," as suggested by the majority (*ante*, p. 853), nor general hostility to the cancellation procedure, where appropriate.

The majority's error in thus judicially adding to the statutory requirements for cancellation stems from its focus on only one legislative purpose as being of "paramount importance," namely, "the preservation of land in agricultural production. . . ." (*ante*, p. 857), while ignoring the purpose of "orderly development" which it must recognize elsewhere (*ante*, p. 856).

Having selected the former goal as the more worthy, the majority then proceeds to adopt whatever canon of construction will be most expedient to support its reading of the Williamson Act. Thus it chooses to construe the cancellation provision of the act "*narrowly*" (*ante*, p. 864) in contrast to the "*flexible approach*" which it uses in ascertaining whether there is available other "proximate" land for the "use" intended for the land to be released upon cancellation. (*Ante*, p. 860.) Such obvious juggling of interpretive techniques makes readily apparent the majority's labored effort to "interpret" the act to achieve a result not intended by the Legislature. The issue, of course, is not whether the majority has thereby fashioned a better law. The salient point is that it is no part of our function of appellate review to legislate at all.

In unilaterally promulgating new findings requirements, the majority tightens a steel band around the statutory scheme. The Legislature described explicitly and exclusively its purposes in authorizing the agreements in question (Gov. Code, § 51220) and it permits cancellation of such agreements when they are no longer necessary or desirable

to carry out those purposes. (*Id.*, § 51280.) There is nothing whatever in the applicable statutes which justifies the majority's imposition of any additional limitations on the power of a local agency in its enforcement of the Williamson Act.

The impropriety of this judicial redrafting of the Williamson Act is made manifest when the majority applies one of its new judicial conditions to the facts before us. The majority recites that in 1969 the city's planning department noted that the land was "capable of being developed," that in 1971 the city's plan map designated the parcel for "suburban residential use" and that the Mayor of Hayward did not feel "'that it should have gone in nine years ago, . . . because it was so clearly to me the next piece of land that would be developed . . . .'" (*Ante*, p. 855.) On these facts the majority reasons, mistakenly in my opinion, that because some Hayward officials nine years earlier had recognized that the subject property was suitable for commercial development, the council therefore should not be permitted, belatedly, to acknowledge that fact and now withdraw the parcel from Williamson Act treatment. Rather, the majority concludes that the council must sit idly by for an additional extended period to permit the balance of the 10-year contract to run its course before the procedural handcuffs may be removed both from city officials and from property owners. In my view, such wooden and mechanical application of a statute defies logic, good community planning and common sense.

The fact that the city planner recommended nine years earlier that the subject property not be included in an agricultural preserve and that it be designated "suburban residential use" clearly establishes that its release in 1979 from Williamson Act control was neither premature nor inconsistent with the purposes of the act. For nine years the landowner had the benefit of favorable Williamson Act treatment. For the identical period the public had the full benefit of the green-belt agricultural preserve. The public now will also receive, free of cost, by outright dedication to the City of Hayward approximately one-third of the subject property for "open space environment." A development plan, long anticipated, having fully matured, a municipality should have flexible authority and sufficient elbow room to accommodate both public and private interests to changing conditions.

The constraining procedural straightjacket into which the majority gratuitously locks California municipalities is not required by any provision or purpose of the Williamson Act. Certainly it is not compelled by

the record before us, the sufficiency of which is the only remaining issue for proper review under section 1094.5.

## SUFFICIENCY OF THE EVIDENCE

The findings required by the statute (and made by the council) are fully supported by substantial evidence in light of the whole record. (*Id.*, § 1094.5, subds. (b), (c).) The administrative record here contains an environmental report (required by statute) certified and approved by the council. The report notes that only residential subdivisions and previously "contracted" agricultural preserve lands are contiguous to the 93-acre parcel in question. The record also discloses *a report and recommendation of the city's planning department "that the requested area be deleted from agricultural preserve," "that the public interest would not be harmed,"* and *"that no other parcel is proximate and suitable for the size, type, and use proposed."*

There was additional testimony as to the unavailability of other proximate land for housing development of the type here contemplated —upper middle income. Further evidence established, as well, the uneconomic character of continuing the existing agricultural use of the land in question. The fact that there may have been some countervailing testimony offered on some of these matters, of course, does not demonstrate that the council's findings were not supported by substantial evidence. In determining whether the administrative agency's findings are so supported, "the reviewing court must resolve reasonable doubts in favor of the administrative findings and decision." (*Topanga, supra*, 11 Cal.3d at p. 514.)

The majority frankly admits that "Substantial evidence does appear in the record to support the council's findings that the land was a logical site for the extension of suburban development, that dedication of 30 acres of the site to open space was consistent with the purposes of the act, and that development of the parcel would not seriously jeopardize nearby agricultural uses." (*Ante*, p. 854.) Nonetheless, my colleagues hold that such evidence does not support the council's ultimate finding of consistency with the purposes of the act. The majority so opines on the basis that "It is inconsistent with the purposes of the act to allow abrupt cancellation if nonrenewal would accomplish the same objective." (*Ibid.*) As indicated, however, such an assertion lacks any precedential authority, misconstrues the legislative purpose of the act, and directly conflicts with its clear language.

CONCLUSION

The importance of California's agricultural industry to the state and nation cannot be disputed. That is not the issue before us. Its preservation is essential. It is disingenuous, however, for the majority to rely upon such generalities in interfering with the informed, considered decision of the Hayward City Council that cancellation of the agreement in question as to this property at this time will not adversely affect that laudable goal. We cannot presume that the council, as a responsible local agency, is insensitive either to agriculture or to esthetics. There is substantial evidence in the record as a whole supporting the findings of the council that, on the facts before it, such cancellation is not inconsistent with the purposes of the Williamson Act and is in the public interest. Because those findings in turn support the council's order of cancellation, no abuse of discretion appears and that should be the end of our inquiry.

The council's order should be affirmed.

Clark, J., concurred.

The petition of respondent City of Hayward and real party in interest Ponderosa Homes for a rehearing was denied March 26, 1981, and the judgment was modified to read as printed above. Richardson, J., was of the opinion that the petition should be granted.