TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

DANIEL E. LUNGREN
Attorney General

---

|  |  |  |
|---|---|---|
| OPINION | : | |
| | : | No. 92-302 |
| of | : | |
| | : | JULY 22, 1992 |
| DANIEL E. LUNGREN | : | |
| Attorney General | : | |
| | : | |
| CLAYTON P. ROCHE | : | |
| Deputy Attorney General | : | |
| | : | |

---

The CALIFORNIA FISH AND GAME COMMISSION has requested an opinion on the following question:

Are the ocean ecological reserves established under Article X B of the Constitution to be limited to scientific research to the exclusion of all other human activities?

CONCLUSION

The ocean ecological reserves established under article X B of the Constitution are to be limited to scientific research to the exclusion of all other human activities.

ANALYSIS

Proposition 132 was adopted by the voters at the November 6, 1990 General Election. The measure added Article X B, the "Marine Resources Protection Act of 1990," to the California Constitution. The main focus of Article X B is the regulation and eventual prohibition of the use of gill nets and trammel nets by commercial fishermen off the California coast. However, sections 14 and 15 of Article X B, the focus of this opinion, pertain to the establishment of four new "ecological reserves" by the Fish and Game Commission ("Commission"). Section of article X B provides:

"Prior to January 1, 1994, the Fish and Game Commission shall establish four new ecological reserves in ocean waters along the mainland coast. Each ecological reserve shall have a surface area of at least two square miles. The commission shall restrict the use of these ecological reserves to scientific research relating to the management and enhancement of marine resources."[1]

---

[1] We are informed that the coastline of California is approximately 1,000 miles long.

Section 15 of article X B states:

> "This article does not preempt or supersede any other closures to protect any other wildlife, including sea otters, whales, and shorebirds."

We are asked to determine if section 14 of article X B requires the ecological reserves to be limited in use to scientific research to the exclusion of all other human activities. We conclude that they must be so limited.

Section 14 of article X B appears to supplement "ecological reserves" established pursuant to sections 1580-1585 of the Fish and Game Code.[2] Under these statutory provisions, the Department of Fish and Game ("Department") may acquire land and water areas for the purpose of protecting rare or endangered plants, wildlife, or aquatic organisms or specialized habitats. (§ 1580.) Such ecological reserves are subject to rules and regulations prescribed by the Commission "for the occupation, use, operation, protection, enhancement, maintenance, and administration" of such property. (§§ 1580-1581.) It is unlawful to enter upon such an ecological reserve "[e]xcept in accordance with regulations of the commission." (§ 1583.) For the purposes of sections 1580-1585, "ecological reserve" means "land or land and water areas . . . which are to be preserved in a natural condition for the benefit of the general public to observe native flora and fauna and for scientific study." (§ 1584.) The Department may conduct "programs in ecological reserves it selects to provide natural history education and recreation if those facilities and programs are compatible with the protection of the biological resources of the reserve." (§ 1585.)

At least as to the ecological reserves established pursuant to sections 1580-1585, the Commission has not completely restricted any of them solely to scientific research. An examination of the regulations established by the Commission for the four marine ecological reserves, for example, demonstrates that none are specifically dedicated to scientific research and (1) that entry is allowed into some and not into others and (2) that recreation such as boating and swimming is allowed in some but not in others. Commercial fishing is generally prohibited in all ecological reserves, although the regulations permit recreational fishing from the shore. (See Cal. Code Regs., tit. 14, § 630.)

Additionally, the Legislature has established a number of "Marine Life Refuges." (§§ 10900-10913, 10932.) As to some of these, the authorized uses are specifically restricted to scientific research. (See §§ 10901-10903, 10932, 10502.5, 10502.8, 10655, 10655.5, 10657, 10658, 10661.)

With this statutory background in mind, we return to the wording of Article X B of the Constitution. Must the four new ecological reserves be limited to scientific research to the exclusion of such human activities as swimming, scuba diving, kayaking, wind surfing, and surfboarding, which may have little impact upon the collection of scientific data relative to the management and enhancement of marine resources?

Constitutional measures adopted by the people are to be interpreted by applying the usual rules of statutory construction. As recently stated in *Delaney v. Superior Court,* (1990) 50 Cal.3d 785, 798:

> "We begin with the fundamental rule that our primary task is to determine the lawmakers' intent. (*Brown v. Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 724.)

---

[2]All section references hereafter are to the Fish and Game Code unless otherwise indicated.

In the case of a constitutional provision adopted by the voters, their intent governs. (*Kaiser v. Hopkins* (1936) 6 Cal.2d 537, 538; *Armstrong v. County of San Mateo* (1983) 146 Cal.App.3d 597, 618.) To determine intent, `"The court turns first to the words themselves for the answer."' (*Brown v. Kelly Broadcasting Co., supra,* 48 Cal.3d 711, 724, quoting *Moyer v. Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230.) `If the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature (in the case of a statute) or of the voters (in the case of a provision adopted by the voters).' (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735.)"

In our view, the wording of the Constitution is clear and unambiguous. The language mandates that the use of the four ecological reserves must be "restricted," that is, limited "to scientific research relating to the management and enhancement of marine resources" under regulations to be adopted by the Commission. "To restrict" generally means "to set bounds or limits . . . to place (land) under restrictions as to use (as by zoning ordinances)." (Webster's New Internat. Dict. (3d ed. 1966) p. 1937.)

Language employing the words "restrict to" implies an exclusive limitation *to* the subject matter that follows; a restriction *to* a particular use or activity typically means all other uses or activities are excluded or prohibited. (See, e.g., *Fourcade* v. *City and County of San Francisco* (1925) 196 Cal. 655, 659 [restriction to residential uses is exclusive of other uses].) When use of water has been adjudicated, the courts have referred to the use of water being "restricted to" the land described, meaning the water may not be used elsewhere. (*L.E. Richter* v. *Union Land and Stock Co.* (1900) 129 Cal. 367, 370; *Thayer* v. *California Dev. Co., et al.* (1912) 164 Cal. 117, 122 [water restricted to certain land]; *Rancho Santa Margarita* v. *Vail* (1938) 11 Cal.2d 501, 536.) Similarly, courts have used "restricted to" in the context of land use, and in such cases, when land is restricted *to* a particular use, other uses are prohibited. (*Sierra Club* v. *City of Hayward* (1981) 28 Cal.3d 840, 847 [Williamson Act restriction of land to agricultural uses]; *Arnel Development Company* v. *City of Costa Mesa* (1980) 28 Cal.3d 511, 515, fn. 5 [ordinance restricting use to single-family dwellings]; *Bailard* v. *Marden* (1951) 36 Cal.2d 703, 707 [restricted to use for private single-family residence, not motel].)

The above language should be contrasted with a more general use of the words "restriction" or "restrictions," used to more generally describe prohibitions of one sort or another. Thus, "restrictions" that limit or qualify the use or activity in question do not imply the exclusivity as when something is "restricted to" a particular use or activity. (See, e.g., *Takahashi* v. *Fish and Game Commission* (1947) 30 Cal.2d 719, 735 [limits or qualifications on use of fish]; see also *Yost* v. *Thomas* (1984) 36 Cal.3d 561, 572 [conditions, restrictions, or limitations on land or water use].) Thus, if the constitutional provision in question here provided that the Commission shall place restrictions on the use of the ocean reserves, the Commission would be empowered to prohibit certain activities. The above distinction is the difference between being "restricted to" certain activities and being "restricted from" certain activities. In the latter category, what is restricted is what is prohibited; the constitutional provision, however, is in the former category and implies an exclusion of all activities but that which is identified.

Based on the foregoing, the clear language of the Constitution sets forth an exclusive use for the ocean reserves, that of scientific research. Other uses are necessarily excluded by the language specifying the sole use.

We note that one of the primary authors of Proposition 132 has now expressed what her intent was in framing the provision allowing for the establishment of the ecological reserves and restricting their use to scientific research for the management and enhancement of marine resources.

She asserts that the provision was not meant to exclude fishing, commercial or sport, as the harvesting of fish is part of the definition of marine resource "management," as defined in the code and administrative regulations. She states that the objectives of state policy make it clear that scientific research and management, including sport and commercial uses, are integral aspects of the conservation of aquatic resources, and thus can be compatible with access and the utilization of related resources found within ecological reserves.

However, we note such statements of an initiative's author "would not provide any guidance as to the voters' subsequent intent . . . [since the statements were not] before the voters." (*Delaney v. Superior Court, supra,* 50 Cal.3d at 801.) In any case, the language of the provision does not match the thrust of the sponsor's stated beliefs. While scientific research and management may be integral aspects of the conservation of aquatic resources, the constitutional provision refers to a restrictive use of the ocean reserves for "scientific research relating to the management and enhancement of marine resources," that is, research *on* the management of the resources, not research *and* management. Clearly, if the constitutional provision restricted activity to research *and* management, the argument could be made that sport and commercial fishing would be a part of the restricted use of the reserves, i.e., managed harvest. The sponsor correctly notes that sport and commercial fishing would be permitted *as part of authorized scientific research*. In so noting, she essentially concedes that the only activity permitted is scientific research, irrespective of the form it takes.

Finally, we have examined the voters pamphlet in detail relative to the adoption of Proposition 132. (Ballot Pamp, Gen. Elec. (Nov. 6, 1990) pp. 36-39.) Nothing therein contradicts the stated language of article X B as to what the people intended. Thus, the use of the ecological reserves was intended to be restricted to scientific research and such research must be related to the management and enhancement of marine resources. Whether the basis of the restriction was the protection of surface and subsurface scientific instruments or the belief that the presence of other human activities could not be totally unobtrusive in the collection of scientific data or some other reason is not indicated. All we decide here is that the language speaks for itself; nothing in the ballot pamphlet relative to the voters' intent contradicts it.

Further, even if the constitutional language were ambiguous, the historical context of existing statutes for ecological reserves which permit regulated fishing and other human activity does not serve to support the notion of non-exclusivity in the new constitutionally based reserves. Indeed, it serves to illustrate that the constitutional provision is a departure from existing law; by introducing an exclusive limitation on the use of the four ocean reserves, the voters have expressed an intent to have the reserves treated differently than other closures.

Accordingly, we conclude that the ocean ecological reserves established under article X B of the Constitution are to be limited to scientific research to the exclusion of all other human activities.

\* \* \* \* \*