[No. A117325. First Dist., Div. Five. Aug. 15, 2008.]

COUNTY OF HUMBOLDT, Plaintiff, Cross-defendant and Appellant, v. ROBERT C. McKEE et al., Defendants, Cross-complainants and Respondents;
LINDA HILL, as Assessor, etc., Cross-defendant and Appellant.

COUNSEL

Morgan Miller Blair, Christian M. Carrigan, Kevin R. Brodehl, Todd A. Williams, Bryan W. Wenter; Wendy B. Chaitin, Interim County Counsel, Richard D. Hendry, Deputy County Counsel and Deputy District Attorney, for Plaintiff, Cross-defendant and Appellant and for Cross-defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Mary E. Hackenbracht, Assistant Attorney General, Richard M. Thalhammer and Ellyn S. Levinson, Deputy Attorneys General, for California Department of Conservation as Amicus Curiae on behalf of Plaintiff, Cross-defendant and Appellant and Cross-defendant and Appellant.

Jennifer B. Henning for California State Association of Counties as Amicus Curiae on behalf of Plaintiff, Cross-defendant and Appellant and Cross-defendant and Appellant.

Christian C. Schuering and Jack L. Rice for California Farm Bureau Federation and Sierra Club as Amicus Curiae on behalf of Plaintiff, Cross-defendant and Appellant and Cross-defendant and Appellant.

Allen Matkins Leck Gamble Mallory & Natsis, James L. Meeder, Michael P. Durkee and David H. Blackwell for Defendants, Cross-complainants and Respondents.

OPINION

**SIMONS, Acting P. J.**—In 1965, the Legislature confronted two troubling trends in California: the loss of agricultural land to development and the haphazard growth of suburbia, requiring the "extension of municipal services to remote residential enclaves, and interfer[ing] with agricultural activities." (*Sierra Club v. City of Hayward* (1981) 28 Cal.3d 840, 850 [171 Cal.Rptr. 619, 623 P.2d 180] (*Sierra Club*), superseded by statute on other grounds as stated in *Friends of East Willits Valley v. County of Mendocino* (2002) 101 Cal.App.4th 191, 204–205 [123 Cal.Rptr.2d 708].) "The Legislature perceived as one cause of these problems the self-fulfilling prophecy of the property tax system: taxing land on the basis of its market value compels the owner to put the land to the use for which it is valued by the market." (*Sierra Club*, at p. 850.) In response, it enacted the Williamson Act (Gov. Code, § 51200 et seq.),[1] which employs a two-step strategy to conserve agricultural

---

[1] Unless otherwise indicated, all statutory references are to the Government Code.

lands. The local government first establishes and regulates agricultural preserves, and then executes land conservation contracts with landowners. (§§ 51230–51239, 51240–51257.) These contracts limit the land to agricultural and compatible uses for their duration and may also include terms and conditions more restrictive than those required by the Williamson Act. (§§ 51240, 51243, subd. (a).) In return for accepting restrictions on the land, the landowner is "guaranteed a relatively stable tax base, founded on the value of the land for open space use only and unaffected by its development potential." (*Sierra Club*, at p. 851.) The hallmark of this statutory scheme is its reliance on voluntary agreements between the government and the landowner, where the landowner chooses, on an annual basis, to accept certain limits on his or her use of the land in return for an explicit property tax reduction.

In 1977, plaintiff County of Humboldt (County) and Arthur Tooby made and entered into a Williamson Act contract, which covered a "Class B" agricultural preserve consisting of approximately 12,580 acres. Among other things, this contract set a minimum parcel size of 160 acres for subsequent divisions of the land, consistent with the agricultural preserve guidelines then in effect. One year later, through resolution No. 78-64, the County Board of Supervisors (the Board) revised those guidelines, increasing the minimum parcel size for divisions to 600 acres (the 1978 Guidelines). In 2000, defendants Buck Mountain Ranch Limited Partnership (BMR), Robert C. McKee and Valery McKee,[2] purchased this acreage, and then divided and sold much of the land. Though each parcel sold was larger than 160 acres, some were less than 600 acres.

In 2002, County sued McKee and others for violation of the Williamson Act, violation of the Subdivision Map Act (§ 66410 et seq.), breach of contract, nuisance, and violation of the unfair competition law (Bus. & Prof. Code, § 17200 et seq.). BMR filed a cross-complaint against County and the County Assessor (Assessor), alleging Assessor continued to assess property taxes to BMR for parcels transferred to third party purchasers. The trial court ruled in favor of McKee. It relied upon the contract clauses of the state and federal Constitutions (U.S. Const., art. I, § 10; Cal. Const., art. I, § 9) to conclude that the 1978 Guidelines could not be applied constitutionally to a Williamson Act contract executed in 1977. We disagree and reverse. Subsequent to the adoption of the 1978 Guidelines, the parties voluntarily renewed their contract numerous times, and the new contract created with each renewal incorporated the 1978 Guidelines.

---

[2] Hereafter, the three defendants, BMR, Robert C. McKee and Valery McKee, are collectively referred to as McKee.

## BACKGROUND

### *The Tooby Guidelines*

On February 1, 1977, the Board adopted resolution No. 77-19, which established approximately 12,580 acres of the 13,700-acre Tooby Ranch as a Class B agricultural preserve (Tooby Preserve). On February 15, 1977, the Board rescinded resolution No. 77-19 and replaced it with resolution No. 77-30 (the Tooby Guidelines), which contained a corrected legal description of the Tooby Preserve.[3] The Tooby Guidelines provided in part: "WHEREAS, the land to be included within the agricultural preserve is, and will continue to be, used for the purposes of producing agricultural commodities for commercial purposes and uses compatible with agriculture; and [¶] WHEREAS, this Board is authorized by statute to determine according to uniform rules what constitutes a compatible use of land within each preserve; [¶] NOW, THEREFORE, BE IT RESOLVED as follows: [¶] 1. The hereinafter described real property located in the County of Humboldt is hereby designated and established as an agricultural preserve within the meaning of and pursuant to the [Williamson Act], including amendments thereto, and shall be known as and may be referred to as: [¶] Agricultural Preserve No. 77-19." (Original underscoring.)

The Tooby Guidelines listed compatible uses permitted on the Tooby Preserve. The guidelines further provided that "The land described herein shall not be divided if, as a practical matter, it would result in the reduction of land devoted to the production of agricultural commodities for commercial purposes. This section shall not prohibit a division of land if the parcels created thereby are of such size, shape and other physical characteristics that they are capable of producing agricultural commodities and if as a practical matter the amount of land devoted to agricultural uses will not be reduced. All divisions of land shall comply with all applicable local ordinances and State laws."

### *The Tooby Contract*

On February 1, 1977, the same day the Board established the Tooby Preserve, Arthur Tooby entered into a Williamson Act contract with County (Tooby Contract).[4] The Tooby Contract restricted the Tooby Preserve to agricultural and compatible uses.

---

[3] The two resolutions are substantively identical.

[4] Although the Williamson Act contract was signed by Arthur Tooby on February 8, 1977, the effective date of the contract was designated as February 1, 1977.

The Tooby Contract stated, in relevant part, "WHEREAS, OWNER warrants that he owns certain land particularly described hereinafter, which is presently devoted to agricultural and compatible uses; and [¶] WHEREAS, said land is located in an agricultural preserve heretofore established by COUNTY by Resolution No. 77-19, and [¶] WHEREAS, both OWNER and COUNTY desire to establish binding restrictions which will limit the use of said land to agricultural and compatible uses: [¶] NOW, THEREFORE, the parties agree as follows: [¶] 1. This contract is made and entered into pursuant to the [the Williamson Act] and is subject to all the provisions of said Act as it now exists. [¶] . . . [¶] 3. During the term of this contract or any extension thereof, the land described herein shall not be used for any purpose other than agricultural uses, as defined by said Act, or those 'compatible uses' as set forth in Resolution No. 77-19. [¶] 4. This contract shall be effective on the date first written above, hereinafter the anniversary date, and shall remain in effect and shall be for an initial term of ten (10) years. On the first anniversary date and on each succeeding anniversary date, one year shall automatically be added to the unexpired term unless notice of non-renewal is given as provided by law. [¶] 5. This contract shall run with the land described herein and shall be binding upon, and inure to the benefit of, all successors in interest of the OWNER. [¶] 6. Land subject to this contract may not be divided into parcels of less than 160 acres except for purposes of rental or lease for agricultural and compatible uses provided no additional dwellings shall be constructed or placed upon such divided parcels."

### The 1973 and 1978 Guidelines

Resolution No. 73-163 (1973 Guidelines), adopted by the Board on December 18, 1973, was in effect at the time the Tooby Contract was executed. The 1973 Guidelines set forth the regulations governing agricultural preserves, and provided in part, "Land within a Class A preserve and under contract may not be divided into parcels less than 20 acres. Land within a Class B preserve and under contract may not be divided into parcels of less than 160 acres."

On March 28, 1978, the year *after* the Tooby Preserve was established and the Tooby Contract was executed, the Board adopted the 1978 Guidelines. The 1978 Guidelines set forth revised regulations governing agricultural preserves, and stated in part, "Land within a Class B preserve and under contract shall not be divided into parcels smaller than 600 acres. Land within a Class A or C preserve and under contract shall not be divided into parcels smaller than 100 acres. (Effective for 1979 preserves and under contract)." The 1978 Guidelines expressly rescinded the 1973 Guidelines.

*Sale of the Tooby Ranch*

In August 2000, McKee formed BMR for the purpose of purchasing and selling the Tooby Ranch. On October 17, 2000, McKee closed escrow on the purchase of 13,340 acres of the Tooby Ranch from the estate of Arthur Tooby.[5] In March 2001, Omsberg & Company, a surveying and engineering firm, submitted a report to County in support of McKee's application for lot line adjustments on the Tooby Ranch. The report explained McKee's plans to divide the Tooby Ranch into 44 parcels of 160 acres or more and sell them as "ranchettes."[6]

Since 2000, McKee has transferred approximately 25 separate parcels of land to third party purchasers. Some of the parcels conveyed to third party purchasers are smaller than 600 acres, but there is no evidence that any of the transferred parcels are smaller than 160 acres. At the time of trial, in 2006, McKee retained ownership of approximately 3,000 acres of the Tooby Ranch.

McKee has not filed a notice of nonrenewal of the Tooby Contract. McKee has continued to receive a preferential tax assessment and has paid an average of 44 cents per acre, 10 to 15 percent of the taxes he would have paid had the land not been under a Williamson Act contract.

*Procedural History*

On December 31, 2002, County filed a complaint against McKee and 47 third party purchasers alleged to have bought parcels of the Tooby Ranch from McKee. County filed a first amended complaint on April 1, 2003. County alleged causes of action for violation of the Williamson Act, violation of the Subdivision Map Act, breach of contract, nuisance, and violation of the unfair competition law. County sought penalties, damages, and declaratory and injunctive relief, including an order prohibiting future transfers of Tooby Ranch land and declaring the prior transfers null and void.

BMR filed a cross-complaint against County and Assessor on June 11, 2003, and filed a first amended cross-complaint on August 27, 2003. BMR alleged that Assessor continued to assess property taxes to BMR for parcels transferred to third party purchasers. The cross-complaint sought declaratory relief and an injunction prohibiting Assessor from assessing taxes to BMR for the transferred parcels.

---

[5] The remaining 360 acres were sold to a third party.
[6] McKee later withdrew his application for lot line adjustments.

On December 4, 2003, the trial court issued the first of two bifurcation orders. The court granted McKee's motion to bifurcate the proceedings into two phases: trial of County's claims against McKee, followed by trial of County's claims against the third party purchasers. The court ordered that the third party defendants would not participate or be subject to discovery until the second phase of the action.[7]

On July 25, 2005, the trial court issued its second bifurcation order. The court separated out two predominantly legal issues to be briefed and decided prior to trial of County's claims against McKee: "(1) whether . . . County can legally nullify McKee's conveyances of parcels of the Tooby Ranch to third parties; and (2) whether . . . County's Williamson Act [g]uidelines can be applied retroactively to pre-existing Williamson Act [c]ontracts."

On November 2, 2005, the court issued a ruling on these two legal issues. First, the court ruled that County's 1978 Guidelines could not be applied to the 1977 Tooby Contract. The court reasoned that application of the 1978 Guidelines, which amended the minimum parcel size for Class B preserves from 160 to 600 acres, would violate the contract clauses of the state and federal Constitutions. The court concluded that application of the 600-acre parcel minimum would substantially impair the Tooby Contract, and found that County had failed to show that this impairment was reasonable and necessary to an important public purpose. Second, the court ruled that County could not seek nullification of the parcel conveyances in the instant proceeding. Following a motion for reconsideration by County, the court permitted supplemental briefing and oral argument from both parties. On February 7, 2006, the court issued a "Ruling On: Reconsideration of Bifurcated Issues," affirming its November 2 decision and clarifying that in light of its finding that the 1978 Guidelines could not constitutionally be applied to the Tooby Contract, it did not reach the issue of nullification.

Beginning on August 14, 2006, the court held a bench trial on County's causes of action against McKee for violation of the Williamson Act, violation of the Subdivision Map Act, breach of contract, declaratory relief, and violation of the unfair competition law to the extent this violation was predicated on violations of the Williamson Act or Subdivision Map Act. The court also tried BMR's first amended complaint against County and Assessor. County dismissed its cause of action for violation of the Subdivision Map Act prior to the presentation of evidence. On November 2, 2006, after County completed its presentation of evidence, McKee moved for judgment pursuant to Code of Civil Procedure section 631.8. The court issued an oral ruling

---

[7] This appeal is from the trial court's judgment as to County's claims against McKee and McKee's related cross-claims. The third party purchasers are not parties to this appeal.

granting the motion for judgment on November 2, 2006, and issued a written statement of decision and judgment in favor of McKee on January 16, 2007.

In its statement of decision, the court concluded that McKee had not violated the Williamson Act or the Tooby Contract. The 600-acre minimum in the 1978 Guidelines could not constitutionally be applied to the 1977 Tooby Contract, and County had produced no evidence that any parcel conveyed by McKee to third party purchasers was less than the 160-acre minimum established by the Tooby Contract and the governing 1973 Guidelines. County had also failed to produce evidence of other alleged breaches of the Tooby Contract: County "failed to produce any evidence that the division of the Tooby Ranch created parcels 'of such size, shape and other physical characteristics that they are not capable of producing agricultural commodities.' Indeed, . . . County could not identify a single parcel that failed to meet this requirement of [the Tooby Guidelines]. In addition, . . . County failed to produce any evidence that [McKee's] conveyance of parcels, as a practical matter, reduced the amount of land devoted to agricultural uses." The court issued a judgment in favor of McKee as to County's claims for violation of the Williamson Act, breach of contract, declaratory relief, violation of the unfair competition law, and injunctive relief, and in favor of BMR as to its cross-complaint. The judgment awarded costs to McKee in an unspecified amount. On April 2, 2007, the court issued an order fixing costs in the amount of $26,986.77.

On March 16, 2007, County and Assessor filed a timely notice of appeal from the judgment.

## DISCUSSION[8]

### I. *The Williamson Act*

■ The Williamson Act is a legislative effort to preserve agricultural and open space land and discourage premature urban development. (§ 51220.)[9] It authorizes local governments to establish "agricultural preserve[s]," which consist of lands devoted to agricultural and compatible uses. (§ 51230.) The

---

[8] On June 15, 2007, McKee filed a motion to dismiss this appeal. On August 1, 2007, we denied the motion to dismiss "without prejudice to inclusion of the issues raised in the motion in [McKee's] briefing on the merits."

On September 21, 2007, McKee filed a second motion to dismiss the appeal. Again, we denied the motion to dismiss "without prejudice to inclusion of the issues raised in the motion in [McKee's] briefing on the merits."

McKee did not include the issues raised in the motions to dismiss in the respondents' brief filed December 28, 2007, and therefore we do not address these issues.

[9] Section 51220 provides:

"The Legislature finds:

preserves "shall be established for the purpose of defining the boundaries of those areas within which the city or county will be willing to enter into contracts pursuant to this act." (§ 51230.) Local governments are required to adopt rules governing the administration of agricultural preserves and apply those rules uniformly throughout the preserve. (§ 51231.)

After establishing agricultural preserves, the local government may enter into contracts with landowners with respect to land within a designated preserve and devoted to agricultural use. (§§ 51240, 51242.) These contracts must limit the land to agricultural and compatible uses for the duration of the contract, and, in return, "the landowner is guaranteed a relatively stable tax base, founded on the value of the land for open space use only and unaffected by its development potential." (*Sierra Club, supra*, 28 Cal.3d at p. 851.)

Because the Williamson Act permits preferential tax assessment of land under contract, the California Constitution requires enforceable restrictions on the use of contracted land. (Cal. Const., art. XIII, § 8; Gov. Code, § 51243.6.) The California Constitution states, in relevant part, "To promote the conservation, preservation and continued existence of open space lands, the Legislature may define open space land and shall provide that when this land is enforceably restricted, in a manner specified by the Legislature, to recreation, enjoyment of scenic beauty, use or conservation of natural resources, or production of food or fiber, it shall be valued for property tax purposes only on a basis that is consistent with its restrictions and uses." (Cal. Const., art. XIII, § 8.)

---

"(a) That the preservation of a maximum amount of the limited supply of agricultural land is necessary to the conservation of the state's economic resources, and is necessary not only to the maintenance of the agricultural economy of the state, but also for the assurance of adequate, healthful and nutritious food for future residents of this state and nation.

"(b) That the agricultural work force is vital to sustaining agricultural productivity; that this work force has the lowest average income of any occupational group in this state; that there exists a need to house this work force of crisis proportions which requires including among agricultural uses the housing of agricultural laborers; and that such use of agricultural land is in the public interest and in conformity with the state's Farmworker Housing Assistance Plan.

"(c) That the discouragement of premature and unnecessary conversion of agricultural land to urban uses is a matter of public interest and will be of benefit to urban dwellers themselves in that it will discourage discontiguous urban development patterns which unnecessarily increase the costs of community services to community residents.

"(d) That in a rapidly urbanizing society agricultural lands have a definite public value as open space, and the preservation in agricultural production of such lands, the use of which may be limited under the provisions of this chapter, constitutes an important physical, social, esthetic and economic asset to existing or pending urban or metropolitan developments.

"(e) That land within a scenic highway corridor or wildlife habitat area as defined in this chapter has a value to the state because of its scenic beauty and its location adjacent to or within view of a state scenic highway or because it is of great importance as habitat for wildlife and contributes to the preservation or enhancement thereof.

"(f) For these reasons, this chapter is necessary for the promotion of the general welfare and the protection of the public interest in agricultural land."

■ The Williamson Act was intended "to deny the tax benefits of the act to short term speculators and developers of urban fringe land and to [e]nsure that the constitutional requirement of an 'enforceable restriction' is met"; and, therefore, "the Legislature deliberately required a long-term commitment to agriculture or other open-space use." (*Sierra Club, supra*, 28 Cal.3d at p. 852.) Each contract between the landowner and local government must have an initial term of at least 10 years, and "shall provide that on the anniversary date of the contract or such other annual date as specified by the contract a year shall be added automatically to the initial term unless notice of nonrenewal is given as provided in Section 51245." (§ 51244.) If either the landowner or local government does not wish to renew the contract, the party "shall serve written notice of nonrenewal of the contract upon the other party in advance of the annual renewal date of the contract. Unless such written notice is served by the landowner at least 90 days prior to the renewal date or by the city or county at least 60 days prior to the renewal date, the contract shall be considered renewed as provided in Section 51244 or Section 51244.5." (§ 51245.) The contract is binding on all successors in interest of the owner. (§ 51243, subd. (b).)

■ If the local government or landowner serves a notice of nonrenewal, the land use restrictions in the existing contract remain in effect for the balance of the contract term. (§ 51246.) Upon notice of nonrenewal, "taxes on [the landowner's] property gradually return to the level of taxes on comparable nonrestricted property, as the term of restriction draws nearer to expiration." (*Sierra Club, supra*, 28 Cal.3d at p. 852, citing Rev. & Tax. Code, § 426.)

II. *Applicability of the 1978 Guidelines to the Tooby Contract*

A. *The 1978 Guidelines Were Intended to Apply to Pre-1979 Preserves*

County and Assessor contend the 1978 Guidelines were intended to apply both to preserves established in 1979 and to preserves established before 1979, including the Tooby Preserve established in 1977. McKee asserts that the 1978 Guidelines were intended to apply only to preserves established in 1979 and later, and therefore do not govern the Tooby Preserve.

■ We review this issue of statutory interpretation de novo. (*City of Saratoga v. Hinz* (2004) 115 Cal.App.4th 1202, 1212 [9 Cal.Rptr.3d 791].) The interpretation of local ordinances and resolutions is subject to ordinary rules of statutory construction. (*Da Vinci Group v. San Francisco Residential Rent etc. Bd.* (1992) 5 Cal.App.4th 24, 28 [6 Cal.Rptr.2d 461].) ■ " 'In statutory construction cases, our fundamental task is to ascertain the intent of

the lawmakers so as to effectuate the purpose of the statute. [Citation.] "We begin by examining the statutory language, giving the words their usual and ordinary meaning." [Citations.] If the terms of the statute are unambiguous, we presume the lawmakers meant what they said, and the plain meaning of the language governs. [Citations.] If there is ambiguity, however, we may then look to extrinsic sources, including the ostensible objects to be achieved and the legislative history. [Citation.] In such cases, we " ' "select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." ' " [Citation.]' [Citation.]" (*City of Saratoga*, at pp. 1212–1213.)

We agree with County and Assessor. The 1973 Guidelines provided that "In order to qualify for a Class B preserve and contract, land shall comply with the following requirements: [¶] (1) Minimum Preserve Area. The preserve area shall contain not less than 600 acres of land, and no individual lot or parcel of land shall be less than 160 contiguous acres." (Original underscoring.) The 1973 Guidelines further provided, "Land within a Class B preserve and under contract may not be divided into parcels of less than 160 acres." The revised 1978 Guidelines retained the requirement that in order to qualify for a Class B preserve, the preserve area must contain at least 600 acres of land and individual parcels must be at least 160 contiguous acres. However, the 1978 Guidelines revised the restriction on divisions of land under contract in Class B preserves. The 1978 Guidelines stated, "Land within a Class B preserve and under contract shall not be divided into parcels smaller than 600 acres. Land within a Class A or C preserve and under contract shall not be divided into parcels smaller than 100 acres. (Effective for 1979 preserves and under contract)." The 1978 Guidelines further provided that "Resolution No. 73-163 [(the 1973 Guidelines)] is hereby rescinded."

In interpreting the 1978 Guidelines, both parties focus on the parenthetical that follows the restriction on divisions of land in Class B preserves: "(Effective for 1979 preserves and under contract)." County and Assessor urge that this parenthetical means the 600-acre minimum parcel size is effective both for land in 1979 preserves and for land in preserves already under contract. McKee argues that this phrase means the 600-acre minimum is to be applied only to land within preserves created in 1979 or later and then placed under contract. We find the language of this parenthetical ambiguous and susceptible to both constructions.[10]

---

[10] The language of the restriction itself is also susceptible to these two constructions.

Both parties rely on declarations from former County officials purporting to explain the intent of the 1978 Guidelines. McKee cites to 2005 declarations from two former County staff persons and a former planning commissioner, all of whom were involved in the adoption of the 1978 Guidelines. Each of the declarations states that the 600-acre minimum parcel requirement

■ The construction suggested by McKee, however, would lead to an absurd result. The final provision of the 1978 Guidelines rescinds the 1973 Guidelines, rendering them void and inoperative. If the 1978 Guidelines were intended to apply only to preserves established from 1979 onward, as McKee suggests, then the passage of the 1978 Guidelines would have left County with no operative regulations for preserves established before 1979. This result is contrary to the apparent purpose of the 1978 Guidelines, to establish revised regulations governing agricultural preserves. Moreover, County's failure to maintain operative regulations for pre-1979 preserves would violate the Williamson Act, which *requires* local governments to adopt rules governing the administration of agricultural preserves. (§ 51231.)[11] We construe the 1978 Guidelines so as to avoid this consequence, and conclude the 1978 Guidelines were intended to apply to both 1979 preserves and preserves already "under contract," that is, both preexisting and future preserves. Therefore, the 1978 Guidelines were intended to apply to the Tooby Preserve, which had been established in 1977.

At oral argument, McKee contended that his interpretation of the 1978 Guidelines would not leave County without operative regulations for pre-1979 preserves. McKee appeared to argue that the 1978 Guidelines rescinded only those provisions of the 1973 Guidelines related to the establishment of new preserves, leaving intact the provisions related to the ongoing regulation of preserves. But, the 1978 Guidelines broadly state that "Resolution No. 73-163 [(the 1973 Guidelines)] is hereby rescinded," without limiting that rescission to any particular aspect of the 1973 Guidelines.

■ McKee also contended at oral argument that divisions of the Tooby Preserve need not be governed by the 1973 or 1978 Guidelines, because those divisions were governed by the 1977 Tooby Guidelines. But this argument provides little comfort to McKee. The Tooby Guidelines directly address the

---

in the 1978 Guidelines was intended to apply only to newly established Class B preserves, not to preexisting Class B preserves. County and Assessor point to a 2006 declaration from a former County planning commissioner involved in the adoption of the 1978 Guidelines, which states that the 1978 Guidelines were intended to apply to preserves already under contract in 1978. We conclude that these declarations, written over 25 years after the adoption of the 1978 Guidelines and stating conflicting understandings of the 1978 Guidelines' intent, do not dictate any particular construction of the 1978 Guidelines.

[11] Section 51231 provides, in pertinent part, "For purposes of this chapter, the board or council, by resolution, shall adopt rules governing the administration of agricultural preserves, including procedures for initiating, filing, and processing requests to establish agricultural preserves. Rules related to compatible uses shall be consistent with the provisions of Section 51238.1." McKee argues this statute authorizes only resolutions prescribing procedural rules, but the statutory language is to the contrary. First the statute states that the authorized rules may impose certain procedural requirements, without limiting the rules to nonsubstantive areas. Second, the statute specifically authorizes rules "related to compatible uses . . . consistent with the provisions of Section 51238.1." Such rules would be substantive in nature.

issue in our case and provide, "All divisions of land shall comply with all applicable local ordinances and State laws."[12] This provision is properly interpreted to require compliance with the local and state laws in existence at the time of the land divisions. (*City of Torrance v. Workers' Comp. Appeals Bd.* (1982) 32 Cal.3d 371, 379 [185 Cal.Rptr. 645, 650 P.2d 1162] [" '[w]hen an instrument provides that it shall be enforced according either to the law generally or to the terms of a particular . . . statute, the provision must be interpreted as meaning the law or the statute in the form in which it exists at the time of such enforcement' "]; *Hermosa Beach Stop Oil Coalition v. City of Hermosa Beach* (2001) 86 Cal.App.4th 534, 556 [103 Cal.Rptr.2d 447] (*Hermosa*).) Thus, even if McKee is correct and the Tooby Guidelines govern, any division of land in the Tooby Preserve would be subject to the Board rules in existence at the time of division.

■ McKee also contends the 1978 Guidelines cannot be construed to apply to pre-1979 preserves absent a clear indication of intent to do so, because this is a retroactive application of the 1978 Guidelines. It is well settled that "[s]tatutes do not operate retroactively unless there is a clear indication of intent that they do so. [Citations.]" (*Hermosa, supra*, 86 Cal.App.4th at p. 549.) However, application of the 1978 Guidelines to preserves established before 1979 is not, as McKee suggests, a retroactive application. "A statute has retroactive effect if it substantially changes the legal effect of past events. [Citations.] 'A statute does not operate "retrospectively" merely because it is applied in a case arising from conduct antedating the statute's enactment [citation], or upsets expectations based on prior law. Rather, the court must ask whether the new provision attaches new legal consequences to events *completed* before its enactment.' " (*Id.* at p. 550, quoting *Landgraf v. USI Film Products* (1994) 511 U.S. 244, 269–270 [128 L.Ed.2d 229, 114 S.Ct. 1483].) Application of the 600-acre parcel minimum in the 1978 Guidelines to preserves established in 1978 and earlier is a prospective application of the law so long as it applies only to future (that is, post-1978) divisions of existing Class B preserves. As with a new zoning regulation, this revision of the minimum parcel size for existing Class B preserves may upset the expectations of landowners, but it is not a retroactive application of the law. (See *Landgraf*, at p. 269, fn. 24 ["[e]ven uncontroversially prospective statutes may unsettle expectations and impose burdens on past conduct: a new property tax or zoning regulation may upset the reasonable expectations that prompted those affected to acquire property . . ."].) Thus, we do not require a clear indication of intent that the 1978 Guidelines apply to pre-1979 preserves.

---

[12] We note that the Tooby Contract, when executed, provided for a minimum parcel size on division of 160 acres, which was consistent with the requirements then imposed by County's zoning ordinances and the 1973 Guidelines.

Finally, McKee argues that County advised McKee that the 160-acre minimum parcel size governed the Tooby Preserve, and County's and Assessor's current position that the 1978 Guidelines were intended to apply to pre-1979 preserves "is simply contrary to . . . the repeated admissions of . . . County." McKee refers us to several letters written by County staff persons between 2000 and 2002, which informed McKee that the Tooby Ranch land could not be divided or conveyed in parcels of less than 160 acres. However, these letters do not discuss either the 1973 or the 1978 Guidelines, and make no representations as to whether the 1978 Guidelines apply to the Tooby Preserve. Indeed, two of the three letters expressly refer McKee to County's *zoning* regulations for Class B preserves, which prohibit conveyances of parcels of less than 160 acres. A county's agricultural preserve guidelines are separate from, and may be more restrictive than, its zoning regulations. (See 54 Ops.Cal.Atty.Gen. 90, 92 (1971).)

McKee also relies on a 1987 memorandum from County's deputy counsel to its planning director regarding a different agricultural preserve. The memo stated the deputy counsel's opinion that a proposed rezoning of land under contract in the "Branstetter Estate" would be permissible: "The land under contract is governed by the Williamson Act provisions of the Government Code, Humboldt County Resolution No. 73-163 [(the 1973 Guidelines)] (which sets forth the guidelines for establishing agricultural preserves at the time this preserve was established), Resolution No. 77-16 (which established this specific preserve), and the land conservation contract entered into by Ms. Branstetter. . . . [¶] Because the contract does not prohibit divisions except those into parcels of less than 160 acres, the proposed minimum parcel size for Parcel 2 would not appear to violate the contract because the minimum proposed parcel size is 193 acres." This memo was not written to McKee and did not relate to the Tooby Preserve.

■ McKee's reliance on County's prior "admissions" as to the applicability of the 1973 Guidelines is, in essence, an argument that County should be estopped from applying the 1978 Guidelines to the 1977 Tooby Preserve. In general, the four required elements for application of the doctrine of equitable estoppel are: " '(1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury.' " (*City of Long Beach v. Mansell* (1970) 3 Cal.3d 462, 489 [91 Cal.Rptr. 23, 476 P.2d 423].) In addition, a government agency may be bound by an equitable estoppel only if "the elements requisite to such an estoppel against a private party are present and, in the considered view of a court of equity, the injustice which would result from a failure to uphold an estoppel is of sufficient dimension to justify any effect upon public interest or policy which would result from the raising of an estoppel." (*Id.* at

pp. 496–497.) Estoppel against a government agency will be applied only "in the most extraordinary case where the injustice is great and the precedent set by the estoppel is narrow." (*Smith v. County of Santa Barbara* (1992) 7 Cal.App.4th 770, 775 [9 Cal.Rptr.2d 120].)

McKee cannot demonstrate that this is an extraordinary case justifying application of the narrow doctrine of government estoppel. McKee does not attempt to satisfy the four required elements of estoppel against a private party, or to meet the heightened standard for application of an estoppel against the government. McKee never seeks to explain why opinions regarding zoning laws or opinions provided to different landowners should estop the application of the 1978 Guidelines to the Tooby Preserve. County is not estopped from applying these guidelines to the Tooby Preserve.

B. *The Tooby Contract Incorporated the 1978 Guidelines upon Renewal*

Having concluded that the 1978 Guidelines were intended to apply to preexisting preserves, including the 1977 Tooby Preserve, we next address the trial court's ruling that the contract clauses contained in the federal and California Constitutions barred application of the 1978 Guidelines to the 1977 Tooby Contract. County and Assessor argue the contract clause analysis was unnecessary, because the 1978 Guidelines were incorporated into the Tooby Contract when the parties renewed the contract following adoption of the 1978 Guidelines. McKee contends that interpreting the Tooby Contract to incorporate the 1978 Guidelines upon contract renewal would permit County to unilaterally amend the Tooby Contract, rendering the contract unjust and inequitable. This presents issues of statutory and contract interpretation subject to de novo review. (*City of Saratoga v. Hinz, supra*, 115 Cal.App.4th at p. 1212; *Hermosa, supra*, 86 Cal.App.4th at pp. 548–549.)

Under the Williamson Act's automatic renewal provisions, each contract must provide that on the contract's anniversary date or another specified annual date, a year will automatically be added to the contract term unless the landowner or local government gives notice of nonrenewal. (§ 51244.) If, in a given year, either party wishes not to renew the contract, the party must serve written notice of nonrenewal in advance of the annual renewal date. (§ 51245.) In the absence of timely notice of nonrenewal, "the contract shall be considered renewed" on the anniversary date or other specified date. (§ 51245.)

In *County of Marin v. Assessment Appeals Bd.* (1976) 64 Cal.App.3d 319 [134 Cal.Rptr. 349] (*Marin*), the Court of Appeal held that, because a Williamson Act agreement was renewed by the parties each year, laws

enacted after the original contract date could be considered when analyzing the agreement. (*Marin*, at p. 327, fn. 7.) In *Marin*, landowners entered into several Williamson Act agreements in 1966 and 1967 that restricted the land to agricultural use. The agreements expressly incorporated all provisions of the Williamson Act, and stated, in compliance with the renewal provisions of the act,[13] that " '[t]*his agreement shall be automatically renewed* at the end of each year *for an additional ten (10) year period,* unless notice of non-renewal is given as provided in Section 51245 . . . .' " (*Marin*, at pp. 325–326 & fn. 5.) In 1971, following 1969 legislative amendments to the Williamson Act, the county requested that the landowners consent to modification of the agreements. The landowners refused, and the assessor then denied preferential tax assessment for the land. (*Marin*, at pp. 322–323.) On appeal, the county argued that the agreements did not contain enforceable restrictions, as they did not contain substantially similar or more restrictive terms than those required by the Williamson Act. (*Marin*, at p. 323.) The Court of Appeal rejected this argument, holding that the agreements contained enforceable restrictions and therefore the land was entitled to preferential tax treatment. (*Id.* at p. 325.)

The Court of Appeal acknowledged an apparent conflict between provisions in the agreements and the Williamson Act: the eminent domain clauses in the agreements were more favorable to the landowners than the eminent domain provisions in the 1965 Williamson Act and the 1969 amendment to the Williamson Act. (*Marin, supra,* 64 Cal.App.3d at pp. 326–327.) The court relied on the 1969 amendment in its analysis of the earlier 1966 and 1967 agreements, reasoning that "[t]he 1969 amendment to the Williamson Act may be properly considered in this contractual dispute, because in a legal sense every year a new agreement is entered into between the parties. As noted earlier, pursuant to an express proviso, the Agreements are automatically *renewed* at the end of each year for an additional 10-year period unless a notice of nonrenewal is given by the parties . . . ." (*Marin*, at p. 327, fn. 7.) The court held that because the agreements expressly incorporated all provisions of the Williamson Act, the disputed provisions of the agreements would be

---

[13] At the time the *Marin* agreements were executed in 1966 and 1967, section 51244, part of the Williamson Act read in part, "The term of each contract shall be 10 years. The contract shall be automatically renewed at the end of each year for an additional 10-year period, unless notice of nonrenewal is given as provided in Section 51245." (Stats. 1965, ch. 1443, § 1, pp. 3377, 3379.) In 1967, this paragraph was amended to read, "Each contract shall be for an initial term of 10 years. Each contract shall provide for renewal options so that on the anniversary date of the contract or such other annual date as specified by the contract a year shall be added automatically to the initial term unless notice of nonrenewal is given as provided in Section 51245." (Stats. 1967, ch. 1371, § 3, p. 3216.) The 1967 revision of the renewal provision was not intended to be a substantive change. (Assemblymember Pattee, letter to Governor Ronald Reagan re Assem. Bill No. 1725 (1967–1968 Reg. Sess.) Aug. 10, 1967, Governor's chaptered bill files, ch. 1371.)

interpreted to conform with the more restrictive provisions of the act. (*Marin*, at pp. 325–328.)[14]

As in *Marin*, the 1978 Guidelines "may be properly considered in this contractual dispute," because the parties entered into a new contract each year pursuant to the automatic renewal provisions in the Tooby Contract and the Williamson Act. (*Marin, supra*, 64 Cal.App.3d at p. 327, fn. 7.) In compliance with the Williamson Act renewal provisions (§§ 51244, 51245), the Tooby Contract provided that "This contract shall be effective on the date first written above, hereinafter the anniversary date, and shall remain in effect and shall be for an initial term of ten (10) years. On the first anniversary date and on each succeeding anniversary date, one year shall automatically be added to the unexpired term unless notice of non-renewal is given as provided by law." Neither party to the Tooby Contract has given notice of nonrenewal of the Tooby Contract, and McKee has continued to receive preferential tax treatment on the Tooby Preserve land. In the absence of timely notice of nonrenewal, "the contract shall be considered renewed" on each anniversary date. (§ 51245.) Thus, the Tooby Contract, originally entered into between Arthur Tooby and County on February 1, 1977, was renewed on February 1, 1978, again on February 1, 1979, and on each anniversary date thereafter.

 We agree with the reasoning in *Marin* that, as a legal matter, by *renewing* a Williamson Act contract on each anniversary date, the parties entered into a *new* contract each year. (See Black's Law Dict. (8th ed. 2004) p. 1322, col. 2 [defining "renewal" as "3. The re-creation of a legal relationship or the replacement of an old contract with a new contract, as opposed to the mere extension of a previous relationship or contract"].) Each year, a landowner bound by a Williamson Act contract has a choice: give timely notice of nonrenewal, which preserves the current 10-year contract, or decline to give notice of nonrenewal, which renews the contract for a new 10-year term. By choosing not to give notice of nonrenewal, the landowner gains both the burdens and the benefits of a new 10-year contract. The landowner remains burdened by restrictions on the use of the contracted land for the balance of the new 10-year term, but also benefits from the preferential tax assessment guaranteed for enforceably restricted agricultural land. (§ 51243; *Sierra Club, supra*, 28 Cal.3d at p. 851.) This preferential tax assessment is not available once the landowner gives notice of nonrenewal: upon notice of nonrenewal, taxes gradually return to the level of taxes on

---

[14] We note that unlike the *Marin* agreements, the Tooby Contract itself does not expressly incorporate the provisions of the Williamson Act or other applicable laws. However, as discussed, *ante*, resolution No. 77-19, which established the Tooby Preserve and was adopted on the effective date of the Tooby Contract, does contain such language: the resolution states that "All divisions of land shall comply with all applicable local ordinances and State laws."

comparable nonrestricted property. (Rev. & Tax. Code, § 426; *Sierra Club*, at p. 852.) Thus, the decision not to give a notice of nonrenewal binds the landowner to a new 10-year contract.

Because the parties to the Tooby Contract entered into a new 10-year contract on February 1, 1979, all applicable laws and ordinances then in existence, including the 1978 Guidelines, became part of the Tooby Contract. (*Castillo v. Express Escrow Co.* (2007) 146 Cal.App.4th 1301, 1308 [53 Cal.Rptr.3d 485].) In the 22 years after adoption of the 1978 Guidelines, Arthur Tooby and McKee collectively renewed the original contract at least 22 times. The 600-acre minimum parcel size for divisions of Class B preserves imposed by the 1978 Guidelines applied to the subsequent divisions of the Tooby Preserve.

McKee argues that *Marin* is distinguishable because the renewal provision in the *Marin* agreements is worded differently than the renewal provision in the Tooby Contract. The *Marin* provision stated that " '[*t*]*his agreement shall be automatically renewed* at the end of each year *for an additional ten (10) year period,* unless notice of non-renewal is given as provided in Section 51245 . . . .' " (*Marin, supra,* 64 Cal.App.3d at pp. 325–326, fn. 5.) The Tooby Contract provided, "This contract shall be effective on the date first written above, hereinafter the anniversary date, and shall remain in effect and shall be for an initial term of ten (10) years. On the first anniversary date and on each succeeding anniversary date, one year shall automatically be added to the unexpired term unless notice of non-renewal is given as provided by law." McKee argues that the Tooby Contract language indicates that the original contract *remains in effect,* whereas the *Marin* language suggests the contract is *renewed.*

Although the Tooby Contract renewal provision is worded slightly differently than the *Marin* renewal provision, we do not find this difference significant. The Tooby Contract provision, together with the governing Williamson Act provisions, make it clear that the Tooby Contract is automatically renewed each year absent notice of a contrary intent. (§§ 51244, 51245.) The Tooby Contract states that a year is automatically added to the initial contract term on each anniversary date "unless notice of non-renewal is given as provided by law." This provision is in compliance with the Williamson Act, which requires each contract to provide that "a year shall be added automatically to the initial term unless notice of nonrenewal is given" and states that unless timely notice of nonrenewal is given prior to the renewal date, "the contract shall be considered renewed." (§ 51244, 51245.) These provisions make clear that the contract is annually "renewed," and does not simply remain in effect. In addition, published decisions addressing the Williamson Act have consistently described sections 51244 and 51245 as

effecting automatic renewal of the contract each year. Our Supreme Court explained, "[i]f neither party gives timely notice to the other of a contrary intent, the contract automatically renews itself each year, tacking on an additional year to the period of restriction." (*Sierra Club, supra*, 28 Cal.3d at p. 852; see also *Borel v. County of Contra Costa* (1990) 220 Cal.App.3d 521, 527, fn. 7 [269 Cal.Rptr. 460]; *Honey Springs Homeowners Assn. v. Board of Supervisors* (1984) 157 Cal.App.3d 1122, 1131 [203 Cal.Rptr. 886].)

McKee contends that interpreting the Tooby Contract to incorporate the 1978 Guidelines upon renewal would make the contract " 'extraordinary, harsh, unjust, [and] inequitable.' " In interpreting Williamson Act contracts, ordinary principles of contract interpretation apply. (*Marin, supra*, 64 Cal.App.3d at p. 324.) Among these principles, "[W]here a contract is susceptible of two interpretations, the courts shall give it such a construction as will make it lawful, operative, definite, reasonable and capable of being carried into effect if it can be done without violating the intention of the parties. [Citations.] . . . [T]he court shall avoid an interpretation which will make a contract extraordinary, harsh, unjust, inequitable or which would result in absurdity [citations]." (*Id.* at p. 325, italics omitted.) McKee argues that County's and Assessor's proffered interpretation would violate these principles, because it would subject the contract to "unilateral amendment by . . . resolution at any time." We disagree.

Under the interpretation advanced by County and Assessor, County is not free to "unilaterally amend" the Tooby Contract. The Board is authorized, and indeed required, to pass uniform rules applicable to agricultural preserves. (§ 51231.) When, as here, the Board adopts a resolution that affects land under contract, the landowners who are parties to those contracts and do not wish to be governed by the new resolution may choose not to renew their contracts. If, however, a landowner decides to renew the contract, and avail him or herself of continued preferential tax treatment, the renewed contract incorporates the recently adopted resolution. We do not find this scheme inequitable or unjust.

McKee further argues that "such putative power to amend existing Williamson Act contracts by resolution conflicts with numerous provisions in the Williamson Act which limit that power." McKee points to provisions of the Williamson Act that authorize local governments to enter into contracts with terms more restrictive than those required by the act (§ 51240), and permit parties to rescind a contract upon mutual agreement under certain circumstances (§§ 51254, 51255). McKee argues that permitting local governments to "unilaterally amend the use of agricultural land" would render Williamson Act contracts "meaningless." Again, we disagree. The Williamson Act expressly contemplates regulation of agricultural preserves by local

government resolutions, as well as by contract. (§§ 51231, 51240.) Interpreting Williamson Act contracts to incorporate new regulations upon renewal does not allow local governments to unilaterally amend Williamson Act contracts, because the landowner who chooses to renew the contract agrees to accept the burdens as well as the benefits of the new agreement. We do not find this interpretation in conflict with any of the cited provisions of the Williamson Act.

The facts of this case, on the other hand, demonstrate the inequity that would result from adopting the interpretation put forth by McKee. For more than 20 years after adoption of the 1978 Guidelines, the owners of the Tooby Ranch elected, on an annual basis, to obtain the tax benefits offered by County. They should not be able to ignore the reciprocal burdens imposed.

The significance of this inequity cannot be overstated. As noted by amicus curiae California State Association of Counties, approximately 16.6 million acres of agricultural land in California, or roughly half of all agricultural land in California, is under Williamson Act contracts. (Butcher, *The Forgotten Intent of the Williamson Act: The Regulation of Noncontracted Lands within Agricultural Preserves* (2005) 12 Hastings W.-Nw. J. Envtl. L. & Pol'y 37, 38.) Many Williamson Act contracts date from the late 1960's and early 1970's, and "[p]rogram enrollment has been relatively stable at its present [16] million acres since 1975, with only a relatively small portion of the total entering or leaving during that time." (Will, *The Land Conservation Act at the 32 Year Mark: Enforcement, Reform, and Innovation* (1999) 9 San Joaquin Agric. L.Rev. 1, 8.) These long-term contracts are in keeping with the act's intent to require "long-term commitment to agriculture or other open-space use" (*Sierra Club, supra,* 28 Cal.3d at p. 852), and its requirements of a 10-year minimum initial contract term and automatic annual renewal (§ 51244).

However, such long-term contracts present serious problems if they do not incorporate later adopted regulations upon renewal: application of any regulation adopted after the original contract date could be challenged under the contract clause. This would create substantial uncertainty, among both landowners and local governments, about what regulations apply to land under Williamson Act contracts. Moreover, it would greatly limit the local government's power to address changing land use needs for property under Williamson Act contracts. Land under contract could effectively be shielded from all subsequent efforts to regulate its use.

In addition, if Williamson Act contracts do not incorporate new laws upon renewal, then land under different Williamson Act contracts would be governed by different regulations. The regulations applicable to a particular piece

of contracted land would depend on the date of the original contract, and on whether application of any subsequent regulations had been challenged and declared unconstitutional under the contract clause. Different regulations could apply even to different parcels of land within a single preserve, since one agricultural preserve may include land under several different contracts. This would create administrative problems, and would also conflict with the Williamson Act, which requires local governments to adopt rules governing the administration of agricultural preserves and to apply those laws "uniformly throughout the preserve." (§ 51231.)

 We conclude that the 1978 Guidelines were incorporated into the Tooby Contract upon its renewal in February 1979, and the 600-acre minimum applied to all subsequent transfers of the Tooby Preserve. Therefore, McKee breached the Tooby Contract by transferring parcels smaller than 600 acres. In light of our conclusion that the Tooby Contract incorporated the 1978 Guidelines upon renewal, we need not reach the issue of whether retroactive application of the 1978 Guidelines to the original 1977 Tooby Contract would violate the contract clauses of the state and federal Constitutions. (U.S. Const., art. I, § 10; Cal. Const., art. I, § 9.)[15]

## III. *Nullification*

County and Assessor next contend that the trial court should be instructed to apply nullification as an appropriate remedy or, in the alternative, the nullification issue should be remanded for determination by the trial court. McKee argues that we should not reach the issue of nullification, but instead should permit the trial court to address this issue upon remand.

County's first amended complaint sought, among other remedies, an order declaring that the transfers from McKee to third party purchasers, and successive transfers from third party purchasers, were null and void *ab initio*. On February 7, 2006, the court issued a "Ruling On: Reconsideration of Bifurcated Issues," clarifying that in light of its conclusion that the 1978 Guidelines could not constitutionally be applied to the Tooby Contract, it did not reach the issue of whether County could seek nullification of the parcel transfers.

---

[15] County and Assessor further contend that McKee violated the Williamson Act and the Tooby Contract because (1) McKee failed to maintain commercial agricultural production on the Tooby Ranch, (2) the transfer of parcels reduced the amount of land devoted to commercial agricultural production, and (3) the resulting parcels were not capable of commercial agricultural production. County and Assessor argue that substantial evidence does not support the judgment under Code of Civil Procedure section 631.8 in favor of McKee as to these issues. Because we conclude that reversal of the judgment is required based on the court's erroneous conclusion that the 1978 Guidelines could not be applied to the Tooby Contract, it is unnecessary to address these additional grounds for reversal. (*Natter v. Palm Desert Rent Review Com.* (1987) 190 Cal.App.3d 994, 1001 [235 Cal.Rptr. 718].)

██ The Williamson Act does not require any specific remedy for breach of a Williamson Act contract. (§ 51251.) Instead, section 51251 provides in part, "The county, city, or landowner may bring any action in court necessary to enforce any contract, including, but not limited to, an action to enforce the contract by specific performance or injunction." Even if nullification of the transfers from McKee to third party purchasers is a permissible remedy for breach of a Williamson Act contract, County and Assessor cite no authority compelling the conclusion that the trial court is *required* to apply this remedy in the instant case. Cancellation or nullification of the transfers is not available as a matter of right; instead, "the propriety of granting equitable relief in a particular case by way of cancellation, rescission, restitution or impressment of a constructive trust, generally rests upon the sound discretion of the trial court exercised in accord with the facts and circumstances of the case . . . ." (*Hicks v. Clayton* (1977) 67 Cal.App.3d 251, 265 [136 Cal.Rptr. 512].) On remand, the trial court has discretion to fashion an appropriate remedy based on the particular facts of this case. We express no opinion on whether nullification is a permissible remedy, but instead permit the trial court to address this issue as necessary upon remand.

## IV. *Costs*

██ The trial court awarded costs to McKee. "An order awarding costs falls with a reversal of the judgment on which it is based. [Citation.]" (*Merced County Taxpayers' Assn. v. Cardella* (1990) 218 Cal.App.3d 396, 402 [267 Cal.Rptr. 62].) Because we conclude that the judgment in favor of McKee must be reversed, the order awarding costs must also be reversed.

## DISPOSITION[16]

The judgment on County's complaint and BMR's related cross-complaint and the order awarding costs are reversed. The matter is remanded with instructions to the trial court to (1) vacate its order applying the contract clauses to preclude application of the 1978 Guidelines to the Tooby Contract, (2) issue a new order finding that the 1978 Guidelines do apply to the Tooby

---

[16] On February 25, 2008, County/Assessor requested that we take judicial notice of a February 21, 2008 article in the San Ramon Valley Times entitled *Growth threatening growers.* We do not find the article relevant to our decision and deny the request for judicial notice.

Separately, on February 28, 2008, McKee objected to County/Assessor's reply appendix. In response to McKee's objections, County/Assessor requested, in the alternative, that we take judicial notice of the documents contained in the reply appendix. The documents contained in the reply appendix were filed in the trial court after judgment was entered in this case in January 2007. These documents were not part of the record when judgment was entered, and therefore will not be considered on appeal. (*Reserve Insurance Co. v. Pisciotta* (1982) 30 Cal.3d 800, 813 [180 Cal.Rptr. 628, 640 P.2d 764].)

Contract and that the division and sale of parcels less than 600 acres violate the guidelines, and (3) impose an appropriate remedy for any such violation. County and Assessor are entitled to their costs on appeal.

Needham, J., and Reardon, J.,* concurred.

A petition for a rehearing was denied September 10, 2008, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied November 12, 2008, S166999. Kennard, J., and Baxter, J., were of the opinion that the petition should be granted.

---

*Judge of the Alameda Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.